1

1          UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF NEW YORK
2
     - - - - - - - - - - - - -  X
3
   UNITED STATES OF AMERICA,    :    18-CR-204(NGG)
4
              Plaintiff ,       :
5                                    United States Courthouse
        -against-               :    Brooklyn, New York
6
   KEITH RANIERE, et al.,       :
7                                    January 9, 2019
              Defendant.        :    3:00 o'clock p.m.
8
     - - - - - - - - - - - - -  X
9

10                TRANSCRIPT OF MOTION HEARING
          BEFORE THE HONORABLE NICHOLAS G. GARAUFIS
11               UNITED STATES DISTRICT JUDGE.

12
   APPEARANCES:
13
   For the Government:          RICHARD P. DONOGHUE
14                              United States Attorney
                                BY: MOIRA K. PENZA
15                                  TANYA HAJJAR
                                    KEVIN M. TROWEL
16                              Assistant United States Attorneys
                                271 Cadman Plaza East
17                              Brooklyn, New York

18
   For Deft. K. Raniere:        MARC A. AGNIFILO, ESQ.
19                              TENY ROSE GERAGOS
                                DANIELLE R. SMITH, ESQ.
20

21   For Deft. A. Mack:         SEAN S. BUCKLEY, ESQ.
                                WILLIAM F. McGOVERN, ESQ.
22

23   For Deft. C. Bronfman:     SUSAN R. NECHELES, ESQ.
                                KATHLEEN E. CASSIDY, ESQ.
24                              ALEXANDRA A.E. SHAPIRO, ESQ.
                                FABIEN M. THAYAMBALLI, ESQ.
25

1    APPEARANCES:   (Cont'd)

2
     For Deft. K. Russell:      JUSTINE A. HARRIS, ESQ.
3                               AMANDA RAVICH, ESQ.

4
     For Deft. L. Salzman:      ANDREA S. TAZIOLI, ESQ.
5                               HECTOR DIAZ, ESQ.

6
     For Deft. N. Salzman:      DAVID STERN, ESQ. (Via Phone)
7                               ROBERT SOLOWAY, ESQ.

8
     Court Reporter:            Charleane M. Heading
9                               225 Cadman Plaza East
                                Brooklyn, New York
10                              (718) 613-2643

11   Proceedings recorded by mechanical stenography, transcript
     produced by computer-aided transcription.
12

13

14                         *      *      *

15

16             THE COURT:  You may be seated in the back.

17             Appearances, please.

18             MS. PENZA:  Moira Penza, Tanya Hajjar and Kevin

19   Trowel for the United States.

20             THE COURT:  Good morning.

21             MR. AGNIFILO:  Good morning, Your Honor.  Mark

22   Agnifilo, Teny Geragos and Danielle Smith for Keith Raniere

23   who is present.

24             MS. SHAPIRO:  Good morning, Your Honor.  Alexandra

25   Shapiro, Fabien Thayamballi, Kate Cassidy and Susan Necheles

3

1   for Clare Bronfman who is also present in court.

2         THE COURT:  Thank you.  Good morning.

3         MR. DIAZ:  Good morning, Your Honor.  Hector Diaz

4   and Andrea Tazioli on behalf of Lauren Salzman who is standing

5   here to my left.

6         THE COURT:  Good morning.

7         MS. HARRIS:  Good morning, Your Honor.  Justine

8   Harris and Amanda Ravich for Kathy Russell who is on my right.

9         MR. SOLOWAY:  Good morning, Your Honor.  Robert

10  Soloway appearing for Nancy Salzman and my partner David Stern

11  is appearing remotely by telephone together with Nancy

12  Salzman.  We thank the Court for allowing him to appear with

13  her that way.

14        THE COURT:  Yes.

15        Counsel, are you there on the phone?

16        MR. STERN:  Yes, we are.

17        THE COURT:  All right.  And the defendant is with

18  you, correct?

19        MR. STERN:  That's correct, Your Honor.

20        THE COURT:  All right.  Thank you.

21        All right.  And, finally?

22        MR. BUCKLEY:  Yes.  Thank you, Your Honor.  Sean

23  Buckley and William McGovern on behalf of Ms. Allison Mack who

24  is standing to my right.

25        THE COURT:  All right.  Thank you, everybody.

4

1          Anybody else?  Are we missing anybody?  That's a lot

2    of people.

3          Okay.  Thank you very much.  Be seated.

4          I think we should start, I would like to hear from

5    the government on the subject of the possibility of another

6    superseding indictment because that might foreclose some or at

7    least affect some of the discussion here today.  So?

8          MS. PENZA:  Yes.

9          THE COURT:  Speak.  Who would like to speak on that?

10         MS. PENZA:  I would.

11         THE COURT:  You would like to speak?

12         MS. PENZA:  I would like to speak, Your Honor.

13         THE COURT:  All right.

14         MS. PENZA:  Your Honor, the government continues to

15   expect a superseding indictment in this case.  Of course, we

16   can't promise a superseding indictment.

17         THE COURT:  You can't?  I can't promise a decision

18   that would take into account the superseding indictment that

19   hasn't been filed.  Right?  So there are issues here, as with

20   Count Seven where, without a superseding indictment or

21   withdrawal of Count Seven, I need to decide the motions here

22   as promptly as possible.  So that's my concern.

23         MS. PENZA:  Understood, Your Honor.  There are a

24   number of factors that are weighing into the timing

25   considerations for a superseding indictment.  Obviously, the

1    government is cognizant of the trial date that is set as of

2    now and we are moving expeditiously.

3           One of the items that is in play is the privilege,

4    the discussions regarding privilege as to a number of

5    documents, a number of e-mail communications that the

6    government believes are relevant to our superseding indictment

7    and so one of the things that we are waiting for is resolution

8    of a number of these privilege issues.  In addition, there are

9    always other complications with superseding indictments, but

10   we do anticipate having one.  We just can't give the Court a

11   precise date, but we do understand the benefit to the Court of

12   having that type of certainty.  We just can't provide it at

13   this time.

14          THE COURT:  With regard to Count Seven where there

15   is a venue issue, let's talk about that.

16          Are you planning to withdraw Count Seven?  Do you

17   have any information that would help the Court regarding

18   Count Seven which has been identified as having a venue

19   problem, Count Seven?

20          MS. PENZA:  Sure.  Your Honor, would you mind if

21   Mr. Trowel discusses that issue?

22          THE COURT:  No, I don't mind.

23          MS. PENZA:  Thank you.

24          MR. TROWEL:  Thank you, Your Honor.

25          I think as currently alleged, the government

1   understands and agrees, assuming the defendant doesn't waive

2   venue, that it won't be part of the trial.

3          THE COURT:  I do not think he is waiving venue.  Is

4   that about right?

5          MR. AGNIFILO:  I don't think we're waiving venue.

6          THE COURT:  There you go.

7          MR. TROWEL:  The charge is effectively duplicated by

8   one of the racketeering acts so the evidence at that trial is

9   going to be by and large the same, but the government concedes

10  that as it's currently alleged, it's not appropriate for trial

11  here.  The government will seek to try it in the appropriate

12  district and won't seek to try it here.  There's no dispute

13  over that.

14         THE COURT:  Whether or not there is a superseding

15  indictment, that is the government's plan?

16         MR. TROWEL:  Unless it's superseded to fix the venue

17  defect, but as currently alleged, the government agrees it

18  can't be part of the pending trial.

19         THE COURT:  Okay.  Thank you.

20         Do you want to comment on that at all?

21         MR. AGNIFILO:  No, nothing.

22         THE COURT:  That's it?  Okay.

23         Yes, go on.

24         MS. PENZA:  So, Your Honor, that is really the best

25  we can do in terms of a superseding indictment.

7

1      THE COURT:  Okay.  Well, I am just raising it and,

2  obviously, I am going to go ahead and decide the motions and

3  if you get a superseding indictment in before I decide the

4  motions, then I will ask the defense if it has any relevant

5  comments to make about the superseding indictment that might

6  affect my thinking about their motions to dismiss.  So, you

7  know, it just means that we are compressing this whole process

8  into a shorter span of time making it more difficult to

9  prepare for trial.  That is my concern with waiting on a

10 superseding indictment that may or may not come and in a form

11 which may or may not be helpful to the Court and the defense.

12      MS. PENZA:  We understand that, Your Honor, and we

13 believe that is the best way forward.  The government is

14 concerned about certain things in the defendants' briefing

15 that try to tie things to a superseding indictment that, as

16 you say, may or may not come.  Ultimately, that is not the

17 government's ultimate decision as to whether there is a

18 superseding indictment.

19      THE COURT:  And it is not the defense's decision as

20 to whether an issue can be tied to a deficiency in the

21 indictment.  I will decide that.  If there is no superseding

22 indictment, I will decide it without the superseding

23 indictment.  That's not a problem for me.

24      MS. PENZA:  Understood, Your Honor.

25      THE COURT:  All right.

CMH      OCR      RMR      CRR      FCRR

8

1          MS. PENZA:  Thank you, Your Honor.

2          THE COURT:  I got everyone's briefing --

3     Thank you.

4          MS. PENZA:  Thank you.

5          THE COURT:  -- speaking of which, I want to thank

6     the parties for all the bedtime reading you have provided to

7     me and my clerks.  There is extensive briefing on all the

8     issues and I hope that it is not anyone's plan to go into

9     every last detail of every last case and argument.

10          What I would like you to do today, if at all

11     possible, is to zero in on specific narrow problems with the

12     other side's case regarding your individual clients and to

13     afford the other side then to make a brief comment if

14     necessary.  There is some case law that has come along from

15     the Ninth Circuit and the Second Circuit which I am sure you

16     are going to talk about, but what I would appreciate is if you

17     can keep it to those critical issues that are really the heart

18     of your argument.  So what I think we ought to do is just run

19     down the list.

20          Let's start with Count One on the RICO conspiracy.

21     All the defendants have made motions to dismiss Count One and

22     I understand, Ms. Shapiro, is going to speak on Count One.

23     Why don't you stand over there so everyone can see you.

24          MS. SHAPIRO:  Oh, sure.

25          THE COURT:  And hear you.  I think the microphone is

9

1   working.  We'll double check and just check the microphone,

2   please.

3           MS. SHAPIRO:  Does that work?

4           THE COURT:  Yes, it does.

5           MS. SHAPIRO:  Thank you.

6           THE COURT:  Welcome.

7           MS. SHAPIRO:  Thank you, Your Honor.  And I'm --

8   we've made really, I think, two broad arguments that go to the

9   entirety of Count One and with the Court's permission, I'm

10  going to focus on the defects in the racketeering acts

11  relating, in particular, to the ones that are based on

12  underlying offenses.  Mr. Thayamballi is going to briefly

13  address the deficiencies in the pattern allegations if that's

14  all right.

15          THE COURT:  Do you think that if one of the

16  racketeering acts is withdrawn, that that would require that a

17  new indictment be sought by the government as to Count One?

18          MS. SHAPIRO:  We do, Your Honor.

19          THE COURT:  Why?

20          MS. SHAPIRO:  Because as we argue in our briefs, and

21  by the way, as we pointed out in the reply, the government did

22  not dispute this.  Maybe they're going to dispute it today --

23          THE COURT:  Well, I think we will give them their

24  opportunity.

25          MS. SHAPIRO:  In order to find probable cause to

1  charge Count One, the grand jury, among other things, had to

2  find that there was an enterprise engaged in a pattern of

3  racketeering and they were presented, presumably, with the

4  racketeering acts alleged in the indictment and had to make

5  findings based, findings of pattern based on that evidence and

6  we don't know, sitting here today, which of those racketeering

7  acts they found probable cause as to.  So if some of them, one

8  or more of them are defective, we think the government would

9  have to go back to the grand jury if they wanted to cure it

10  with the ones that are not defective or if they can cure the

11  ones that are defective, to present an appropriate indictment

12  to the grand jury.

13          THE COURT:  Okay.  Go ahead.

14          MS. SHAPIRO:  And I think -- and I take Your Honor's

15  point that you've read all the briefing so I'm going to try to

16  be very brief in response to any of the questions the Court

17  has but I do want to highlight a few things.

18          We think the biggest problem with Count One is that

19  there are multiple racketeering acts which themselves turn on

20  these, on other offenses, and we've detailed, gone into detail

21  about each of the problematic ones in the briefs, but I just

22  did want to highlight a couple of examples and why we think

23  they're problematic.

24          So, one example is Racketeering Act 5-B which

25  charges Ms. Bronfman with money laundering in furtherance of a

11

1    violation of 8 U.S.C. 1324, but that statute, in turn, which

2    is an immigration crime itself has numerous subsections and

3    encompasses at least six distinct offenses and the indictment

4    does not specify which, if any, of those offenses are being

5    referenced.  As a result, we don't know, you know, whether the

6    grand jury was even presented with evidence of a specific

7    violation or what they found.  So that's one example.

8          Another one is in -- sorry, Your Honor -- in 5-A

9    which specifically identifies -- and this is the one with, we

10   think, the First Amendment problem as well.  That offense is

11   encouraging or inducing an alien to come to enter or reside in

12   the U.S. knowing or in reckless disregard to the fact that

13   such coming to entry or residence is in violation of law and

14   we don't know what law.  That's not specified there.  I think

15   we've presented a number of cases demonstrating that this type

16   of specificity is required both as a matter of the grand jury

17   clause and as a matter of the Sixth Amendment requirements of

18   notice.  We've cited a number of cases, I won't go into

19   chapter and verse, but, among others, in this District, the

20   Thompson and Awan cases dismissing for similar reasons.  We've

21   also pointed to the Supreme Court's decision in the Descamps

22   case where in a footnote, the Court said, "If a single statute

23   sets forth several different offenses, a pleading that does

24   not indicate which crime the defendant allegedly committed is

25   insufficient."  So we think that each of the racketeering acts

12

1   that has this problem is fundamentally defective and needs to

2   be dismissed and for the reasons we indicated earlier, that

3   means the whole count has to be dismissed.

4        I do want to just briefly respond to, you know, the

5   government's argument that, you know, it's a RICO conspiracy,

6   it's not a substantive RICO and, therefore, you know, they

7   asserted that they don't have to get into this detail, and I

8   want to make two points in that regard.

9        One is the principal cases they're relying on are

10  the Second Circuit's Applins decision and the

11  Seventh Circuit's Glecier case, but in both of those cases,

12  the courts made clear that at a minimum, the indictment does

13  need to identify specific types of crimes and there's also a

14  reference in both cases to "specific statutory provisions."

15  Given the other authorities that we've cited, you know, that

16  can't just mean identifying, for example, Section 1324 without

17  specifying which crime within that statute is the one that is

18  supposed to be incorporated in, for example, the money

19  laundering offense or the identity offense, theft defense and

20  some of the other racketeering acts.

21        The other thing I wanted to point out in that regard

22  is that although it is true as the government points out,

23  clearly, that for a RICO conspiracy, it doesn't have to prove

24  that any defendant specifically agreed to engage themselves in

25  two racketeering acts, the government does have to prove and

1    the trial jury will be instructed that there was an agreement

2    among two or more persons to participate in an enterprise that

3    would affect interstate commerce through a pattern of

4    racketeering activity.  As, you know, the Sand instructions,

5    for example, make clear, the court then has to instruct the

6    trial jury what is an enterprise and what is a pattern of

7    racketeering activity.  So you can't just say, well, just

8    because an individual defendant doesn't have to specifically

9    agree to commit to racketeering acts, that the grand jury or

10   the petit jury, if the case gets to that stage, doesn't have

11   to actually find a pattern.

12            So for those reasons, we think these are fatal

13   defects in Count One.

14            THE COURT:  I will hear from the government on that.

15            MS. SHAPIRO:  Okay.  I have a couple of other issues

16   I was going to address but I assume the Court --

17            THE COURT:  We will go on to those issues later.

18   Thank you very much.

19            Sir, did you want to add something?

20            MR. THAYAMBALLI:  Your Honor, I was going to address

21   the pattern issues.  So I don't know if you want to address

22   that now.

23            THE COURT:  It can wait or you can do it now.  Just

24   do it.

25            MR. THAYAMBALLI:  Certainly, Your Honor.

14

1        So, Ms. Shapiro's argument was about deficiencies in

2   the individual acts that caused the entire pattern to fail.

3   What I'm going to address is the fact that predicate acts are

4   not related and so they can't amount to a RICO pattern, as

5   Your Honor is aware.

6        THE COURT:  As part of an enterprise, that there

7   would have to be a connection of all the racketeering acts to

8   a particular course of action that's contemplated by the

9   conspiracy, is that what you're saying?

10        MR. THAYAMBALLI:  Yes, Your Honor.  The government

11   has to show two things in the indictment in order to

12   demonstrate relatedness.  It's vertical relatedness, so the

13   relationship between the acts and the enterprise, and, as

14   Your Honor said, the course of conduct where the acts are

15   related to each other under a number of factors that the

16   Second Circuit clarified in its <u>Reich versus Lopez</u> decision.

17        That decision is critical.  The government doesn't

18   really come to terms with it.  It makes clear that there is a

19   distinction between vertical and horizontal relatedness and

20   the Court should scrutinize racketeering acts to determine

21   whether they are, in fact, related.  Of course, the government

22   says that that's an issue for the trial jury and not an issue

23   for the indictment.  They seem to say that they just have to

24   use the word "pattern" and that's enough to charge a pattern

25   of racketeering activity, but that's clearly not the case.  I

15

1   mean, granted, in Section 1962(c), the statutory term is

2   pattern of racketeering activity, but it's not enough to just

3   quote that language.  For example, the government has to

4   allege the racketeering activity that makes up the pattern

5   which goes beyond quoting the language of the statute and

6   indeed courts have also held that the indictment must show

7   that the racketeering acts are related and that they satisfy

8   the continuity requirement.

9          THE COURT:  And that's not just, that's not just an

10  issue for the jury; you want a more robust explanation in the

11  indictment, is that it?

12         MR. THAYAMBALLI:  That's correct, Your Honor.  And I

13  think the government acknowledges that a large number of cases

14  apply that standard, I mean, a number of cases that they cite.

15         They don't address the Procter & Gamble decision

16  from the Second Circuit where the court unequivocally stated

17  that an indictment, like a complaint, must show both

18  relatedness and continuity which are aspects of the pattern

19  requirement, and if the pleadings fail to show either of those

20  requirements, the RICO count must be dismissed.

21         So that's why the government does try to make some

22  effort to show that the acts are related in its brief.  The

23  problem is that it didn't do that in the indictment.  I think

24  the clearest indication of this is the fact that,

25  fundamentally, the racketeering acts break down into two very

1    distinct groups, what we call the DOS acts and the non-DOS

2    acts.

3            As Your Honor is aware, the alleged DOS acts are

4    charged acts of sex trafficking, forced labor, extortion, that

5    are charged against Keith Raniere, Allison Mack and Lauren

6    Salzman who are alleged in the indictment to be members of DOS

7    or the founder of DOS.  By contrast, there are the non-DOS

8    acts which are completely different.  They are relatively

9    bland nonviolent, none-coercive offenses, things like identity

10   theft and inducing the illegal entry of an alien.  They are

11   charged against different participants other than Mr. Raniere.

12   Against Clare Bronfman, Kathy Russell and Nancy Salzman, none

13   of whom are alleged to be members of DOS.

14           THE COURT:  And Raniere is in both groups.

15           MR. THAYAMBALLI:  Mr. Raniere is in both groups,

16   that's true.

17           THE COURT:  And that would appear to be the

18   connection between the DOS acts and non-DOS acts as part of an

19   enterprise.  Isn't that their theory?

20           MR. THAYAMBALLI:  Your Honor, it does appear that

21   their theory of relationship is that everything relates to

22   Mr. Raniere.  The problem for them is that the Second Circuit

23   has said it's not enough.

24           In Reich versus Lopez, the court made very clear

25   that for horizontal relatedness, it is not enough to have a

1    mere overlap of participants and in that case, there was, in

2    fact, an overlap of three participants.  This is a court

3    analyzing a pleading and determining as a matter of law these

4    allegations don't state a claim.

5         Here, there's only one overlapping participant and

6    none of the others overlap.

7         THE COURT:  Thank you.

8         MR. THAYAMBALLI:  Thank you.

9         THE COURT:  I want to hear from the government on

10   this particular, these particular issues.

11        MR. TROWEL:  Thank you, Your Honor.

12        THE COURT:  Go ahead, briefly.

13        MR. TROWEL:  Okay.  There are a couple of sort of

14   broad points that I'd like to make if I could.

15        THE COURT:  Go ahead.

16        MR. TROWEL:  And one of them is that the gist of the

17   defendants' arguments is generally lack of notice and I think

18   one of the important points to take away from the briefing is

19   that the government has gone far beyond what would be required

20   in a typical or what would be required in a RICO conspiracy

21   charge.

22        As Your Honor knows from Bronson, as the Second

23   Circuit has discussed in Applins, as the Seventh Circuit

24   described in Glecier and any number of cases, the government

25   could have alleged specific types.  Those types when alleged

18

1   are simply a line that says violations of 15 U.S.C. 1912 or

2   1956 or whatever it is with no further detail.

3          Part of the inconsistency in the defendants'

4   argument is that were they to prevail here, one result might

5   be that the government sought an indictment that did that.

6   It's clearly approved in the Circuit.  It's clearly approved

7   in other circuits.  That would provide them less notice.  That

8   would not serve their purpose.  Similarly, another possible

9   outcome would be, for example, in Racketeering Act 1-A,

10  there's a cross-reference to 1324(a)(1)(A).  If they were to

11  get the relief they're seeking, the government might simply

12  reindict and note the subparagraphs I through V which are the

13  ones that exist in 1324(a)(1)(A).

14         Given that that would be the remedy, it's difficult

15  to see how they can properly make a notice argument because

16  the allegations are quite specific.  There are sub-predicated

17  racketeering acts that provide additional detail.  There are

18  extensive filings that give a lot of information about the

19  government's theory.

20         Related to this argument, I think it's important to

21  note a number of their arguments and especially Mr. Raniere's

22  rely on an understanding of exactly what the government's

23  charging here.

24         So Mr. Raniere's *Brady* argument, for example, he

25  says:  The government has spoken with numerous women known and

19

1    unknown who have repeatedly debunked the government's core

2    theory.  He says -- he summarizes his understanding of the

3    "heart of the government's argument."  Then, in the same

4    section, he talks about or in his opening brief, he talks

5    about women in Mexico that would provide testimony that would

6    tend to exculpate his clients.

7            These arguments about what the government is

8    arguing --

9            THE COURT:  And that is from Mr. Agnifilo's

10   affirmation, right?

11           MR. TROWEL:  Correct.

12           And these are fundamentally inconsistent with the

13   idea that the defendants don't understand the charge.  I think

14   it's plain from any number of documents filed in the case that

15   that argument is bordering on frivolous, but the fact that

16   they are elsewhere in their brief describing the government's

17   case I think strongly suggests that that's the case.

18           To talk about the two issues that have been

19   discussed so far, the cross reference issue, I think when it

20   comes to -- there are really two issues here.  When it comes

21   to the racketeering counts, the racketeering acts, rather,

22   their argument runs squarely into Glecier, Applins, Bronson,

23   dozens, hundreds of cases charging RICO conspiracy saying that

24   the government simply doesn't have to do what they did here

25   and simply allege a type.  Those arguments, I think,

1   ultimately are, and that argument applies to the count as

2   well, Count Seven, and the reason is that those

3   cross-referenced statutes are not elements of either the

4   racketeering act or the charged crime.

5        The elements -- so, for example, just to take, for

6   example, Racketeering Act 1, Racketeering Act 1 alleges

7   conspiracy to commit identity theft with the intent to commit,

8   aid and abet or in connection with this other crime.  The

9   element is the intent to commit the top level crime, identity

10  theft, with this other crime in mind, so in connection with,

11  for example.

12       Case law is absolutely clear the government doesn't

13  have to prove another violation, the government doesn't have

14  to offer evidence as to the elements of those other

15  violations.  The case law is actually quite clear too, I

16  believe, that the government doesn't have to be unanimous --

17  the jury doesn't have to be unanimous as to the subsections of

18  that cross-referenced crime because the essential element is

19  not the element of 1324.  It's the intent to commit the top

20  level crime by one of these available means.  That same

21  logic -- and I'm happy to provide some case cites to the Court

22  if it's helpful, but that same logic applies to specified

23  unlawful activity.  The jury need not be unanimous as to that.

24       We have not -- the allegations here have not named

25  10, 20 crimes.  They've named a single crime, a single statute

1    that has subsections that are very closely related.  So when

2    you look at 1324, it's transport, harbor.  This is a group of

3    criminal acts that are very closely related such that the

4    difference between them does not, certainly doesn't impede

5    their ability to put together their defense and nor, to go

6    back to Your Honor's original question, does it raise

7    questions about the grand jury.

8            The government had to offer evidence to the grand

9    jury about the intent to commit the top level crime with this

10   other crime in mind.  It was not required to offer the grand

11   jury evidence of a specific subsection nor will it be required

12   to prove to the jury or to get a unanimous verdict from the

13   jury as to one of those subsections.  So, in other words, if

14   half the jury believes that the defendant committed identity

15   theft of 1324(a)(1)(A)(i) and the other half (a)(1)(ii), the

16   government has still met its burden as to the element and the

17   defendant is not entitled to an acquittal.

18           THE COURT:  When this goes forward and we get to the

19   point where we are having a charge conference, we can talk

20   about it.

21           MR. TROWEL:  Exactly.  So I think that's the broad

22   point as to the cross-reference argument, both to the

23   racketeering acts and the charge.

24           On the pattern argument, I think they all but ignore

25   the government's cases from across the Circuits that simply

22

1    say the government doesn't have to allege pattern.  I think my

2    adversary just noted a moment ago that the government went to

3    the indictment and explained to the Court in its brief how

4    pattern is shown.  That's what's required.  The government has

5    alleged purposes, means and methods.  That's what establishes

6    the pattern for purposes of the indictment.  They will

7    obviously have a chance to contest the evidence on that point

8    to the Court and to the jury but here, it's plainly sufficient

9    on its face, that's all that's required, and none of the cases

10   they cite will require more than that.

11              THE COURT:  All right.

12              MR. TROWEL:  Thank you, Your Honor.

13              THE COURT:  Let's talk about the sex trafficking and

14   forced labor conspiracy issues.

15              Mr. Buckley, come on up.

16              MR. BUCKLEY:  Yes.  Thank you, Your Honor.

17              THE COURT:  Good morning, sir.

18              MR. BUCKLEY:  Good morning, Your Honor.  How are

19   you?

20              THE COURT:  I'm well.

21              MR. BUCKLEY:  With the Court's permission.

22              THE COURT:  Yes.

23              MR. BUCKLEY:  So the difficulty that we face here is

24   that the indictment has charged our client with crimes under

25   the Trafficking Victim Protection Act.  This is an act that

23

1    was designed to implement the Thirteenth Amendment's

2    prohibition on slavery as well as to combat the scourge of

3    international human trafficking.  Nevertheless, despite

4    applying that statute to a very unique set of facts as

5    presented here, facts that don't implicate either of those

6    policies or considerations, the government --

7            THE COURT:  Can I just interrupt for a minute and

8    say isn't that a fact issue that the jury has to decide?  Why

9    are you bringing that to my attention?  You are reaching

10   conclusions of fact that really are not permissible at this

11   point, isn't that right?

12           MR. BUCKLEY:  Respectfully, Your Honor, no, that is

13   not correct.  The reason it's appropriate at this point is

14   what the government has done here in the first instance is

15   returned a bare-bones indictment that they concede in their

16   opposition papers does nothing more than track the statutory

17   language.

18           Now, while that may be permissible in certain cases,

19   there are a whole class of cases where it is not permissible

20   to merely track the statutory language.

21           The Second Circuit's decision in Pirro has made

22   clear that there are limitations on that oft cited principle

23   and has made clear that while you may track, while the

24   government may track the statutory language, for purposes of

25   the general description of the offense, the indictment also

1   necessarily must include and be accompanied by some

2   description of facts specific enough to describe a particular

3   criminal act rather than simply a type of crime.

4           As this court has noted, the quantum and type of

5   factual specificity that must be included in an indictment

6   varies according to the charges.  That's from Your Honor's

7   opinion in Urso.  In that case, there are certain parallels

8   with respect to the charges that you dismissed in that case in

9   that this is a case where many of the allegations are premised

10  upon a concept of threats of serious harm akin to extortionate

11  threats.

12          The Second Circuit has also made clear that --

13          THE COURT:  Is withholding, is the threat to

14  withhold funds, collateral, a threat of continuing harm?

15          MR. BUCKLEY:  I'm sorry, a threat of what,

16  Your Honor?

17          THE COURT:  Withhold collateral.

18          MR. BUCKLEY:  Yes.

19          THE COURT:  Would that be a threat of continuing

20  harm?

21          MR. BUCKLEY:  A threat of continuing harm?

22          THE COURT:  Or of harm?

23          MR. BUCKLEY:  Our position, Your Honor, is no, that

24  it is not the threat of harm at all, particularly in a

25  situation where the collateral was voluntarily presented with

25

1    an understanding of how the collateral would be held and the

2    circumstances that may give rise to the release of collateral,

3    if at all.

4              THE COURT:  Well, wouldn't the question be what is

5    in the mind of the person whose collateral is being held,

6    whether that would be a threat of harm?  Maybe you or I would

7    say, you know, that's no threat, I put up collateral all the

8    time, but some person who is under some disability

9    intellectually or emotionally might view it as a threat of

10   harm and that's something that we present to a jury for their

11   determination.  Aren't we sort of jumping ahead of ourselves

12   here?

13             MR. BUCKLEY:  Well, to address Your Honor's point

14   about whether the threat of harm is in the mind of the

15   beholder, the answer to that is no, Judge.  The statute

16   provides that it is the threat viewed from the perspective of

17   an objective person who would have been in the position of the

18   individual and whether that threat or that harm rises to such

19   a level of seriousness for an objective person to feel

20   compelled to remain in either the forced labor situation or is

21   compelled to engage or continue to engage in sex trafficking.

22             THE COURT:  Well, this is an unusual case, you will

23   admit, in many ways and I am just wondering whether the facts

24   of this case might require a careful consideration of whether

25   the individuals who are alleged victims of this alleged

26

1   conspiracy and these substantive crimes that are alleged would

2   put us in a different situation.  I am just wondering how you

3   would view that.

4        MR. BUCKLEY:  Well, Judge, when it's phrased that

5   way, then I think the consideration is a question of fact that

6   would necessarily require information and testimony from the

7   individuals, but just to take a step back, the statute itself

8   provides that it is one to be observed from an objective

9   standard.

10        THE COURT:  All right.

11        MR. BUCKLEY:  Putting that aside though, Judge, the

12   point that I made with respect to threats and reliance upon

13   the Urso decision is that there are requirements when a

14   statute or a crime as alleged relies upon generic terms,

15   generic terms such as threat, a generic term such as serious

16   harm, a generic term such as sexual act, terms that embrace a

17   variety of meanings.  Under the Second Circuit's precedence,

18   it is not sufficient in those situations merely to put forward

19   a bare-bones indictment and the use of generic terms requires

20   that there be some particularity, a dissent into some factual

21   particulars.

22        Here, the government has made no effort to address

23   those precedents, it has made no effort to explain why it is

24   that the indictment relies upon the bare bones recitation of

25   merely the statutory elements and it doesn't address the

27

1    Second Circuit's clear statement in Pirro that there are

2    limitations on the permissible scope of merely relying upon

3    the statute.

4            So, just a couple of examples because I know Your

5    Honor has read the briefing, but there's a number of reasons

6    why the forced labor and trafficking counts require heightened

7    pleading here.

8            As I noted a moment ago, they use generic terms

9    similar to an extortion case.  They are alleged to involve

10   unspecified threats or implied threats of unspecified serious

11   harm.  In many instances, they do not name victims, relying

12   upon unspecified lower ranking members.  The details with

13   respect to the location of the crimes are ambiguous at best.

14   For example, they allege in each count in the Eastern District

15   of New York and elsewhere which is far broader and less

16   specific than what the Tomasetta court found to be

17   inappropriate where they alleged Worcester, Massachusetts.

18           Similarly, there's no detail about the alleged

19   commercial sex acts, who performed them, when, where, or one

20   thing about this --

21           THE COURT:  Excuse me just a minute.

22           Could you turn off your microphones at the tables

23   because it is interfering with our ability to hear unless you

24   have something to say in which case turn them on.

25           Sorry, sir.  Sorry to interrupt.

28

1          MR. BUCKLEY:  No problem.

2          So as I was saying, commercial sex acts, there's no

3   indication in the pleading as far as who performed them, when,

4   where or what thing of value was exchanged to whom or on

5   account of them and they allege a broad time period spanning

6   September 2015 to 2017.

7          When you take a look at those bare bones allegations

8   unsupported by any facts, it becomes clear that this

9   indictment as pled, given the nature of the crimes charged,

10  the unique application of the statutes that I described at the

11  outset, that this indictment doesn't satisfy either the Fifth

12  or the Sixth Amendment's pleading requirements.  It doesn't

13  establish that it has charged a crime with sufficient position

14  to inform the defendant of the nature of the cause of action.

15  There isn't enough detail in there for the defendant to be

16  able to determine what it is she must be prepared to meet at

17  trial.

18         Equally concerning, as Your Honor has noted and as

19  the Second Circuit and the Supreme Court has noted, an

20  indictment of this nature that is so reliant upon generic

21  terms, that cites to just such broad types of conduct does not

22  provide sufficient factual particularity to ensure that at

23  trial, the government will not fill in elements of the crime

24  with facts not considered by the grand jury.  This indictment

25  doesn't permit anyone to understand what facts about each of

1  the offenses and about which purported victims were presented

2  to the grand jury.

3          Now, to shift from there, Your Honor, and given that

4  it fails both of those tests, it should be dismissed for a

5  facial violation of the indictment clause.

6          Now, in their opposition papers, as I noted, the

7  government falls back simply on the old adage that we need

8  merely only track the language of the statute.  I think I've

9  explained why that is the case.  But here, the government then

10  tries to salvage this indictment by arguing that, well, the

11  defendants here have sufficient notice with respect to each of

12  these counts because the complaint and the detention letters

13  filed in this case lay out the factual allegations and,

14  therefore, that's why the bare bones indictment here is

15  sufficient.

16          THE COURT:  Well, it is in the nature of, they are

17  claiming that they provided some discovery to put more meat on

18  the bones, so to speak.

19          MR. BUCKLEY:  That's correct, Judge.

20          THE COURT:  That's what they say.

21          MR. BUCKLEY:  That's what the government --

22          THE COURT:  Got it.

23          MR. BUCKLEY:  The law is clear in the first instance

24  that such discovery, such additional information cannot cure a

25  constitutional defect with the indictment, and they shouldn't

1    be permitted to do so here, but our point is even putting

2    aside the constitutional vagaries and insufficiencies of the

3    indictment as pled, when you take those additional facts, when

4    you take the government's proffer of the relevant facts here

5    as contained in the complaint and the bail letters, putting

6    aside the constitutional insufficiencies, the indictment and

7    the complaint as alleged still fail to state a claim.

8            In particular, with respect to the forced labor

9    count, the labor and services as I noted are entirely

10   unspecified in the indictment.  They're referred to merely as

11   labor services in paragraphs 33 and 35.  With respect to those

12   that are described in the complaint, they are not the types of

13   labor or services that constitute the paradigmatic forced

14   labor that other courts, when considering the application of

15   this statute, have found to qualify as forced labor.  Those

16   are typically prostitution, sweatshop work, manual labor or

17   domestic service.

18           Here, in the complaint, what's alleged are

19   essentially favors.  They're not tasks that would be performed

20   by an employee for an employer.  They're not tasks that

21   somebody would perform with expectation of compensation.

22   They're things like bringing other members of the organization

23   coffee, picking up groceries for them, making them lunch,

24   carrying luggage, things of that nature.  So just the labor

25   and services, even as identified with the benefit of the

1   allegations of the complaint, fall well outside the

2   paradigmatic forced labor that is typically considered in a

3   criminal prosecution for forced labor.

4          Another problem with the forced labor count which

5   also dovetails with the trafficking count is that the means

6   used allegedly to obtain these favors cannot qualify as

7   serious harm or threats of serious harm under the statute.

8          In the first instance, neither the complaint nor the

9   indictment established that Ms. Mack or anyone else obtained

10  these favors by means of the threats alleged in the complaint.

11  Once again, even the nature of the threats and the means and

12  methods used purportedly to bring about this forced labor,

13  once again, these fall well outside of what other courts have

14  considered appropriate.

15          THE COURT:  Or onerous?

16          MR. BUCKLEY:  Or onerous, correct, Judge.

17          THE COURT:  I think that's the standard, whatever

18  "onerous" means.

19          MR. BUCKLEY:  Onerous or sufficient to compel

20  somebody to remain in a position of servitude, of forcible

21  servitude, or compel somebody to continue to engage in

22  commercial sex acts.  But those typical characteristics that

23  courts have considered, none of those are present here.  None

24  of them are alleged in the complaint.

25          THE COURT:  I mean, one of the problems is this

1    isn't a civil case where we would have extensive discovery

2    before trial where the Court could test out some of these

3    terms and hook them up to the facts that are developed in

4    discovery and where we would have a summary judgment motion.

5    So that makes it more difficult for you and for the Court to

6    measure whether something, whether a behavior is sufficiently

7    onerous or outrageous or whatever term you want to use to

8    constitute forced labor.  And, again, the question is how much

9    of this do I have to resolve on a motion to dismiss and how

10   much of it, if there is a conviction, do I resolve on a

11   Rule 29 motion.  So there you go.

12              MR. BUCKLEY:  Yes.  Understood completely,

13   Your Honor, and I think the point that Your Honor just made,

14   again, comes back to my first point and really underscores the

15   problem with the indictment as alleged here.

16              We're in a position where we have to go to the

17   allegations of the complaint.  Indeed, the government had to

18   go to the allegations of the complaint to try to explain what

19   it is that the indictment means and what the serious harm that

20   they're alleging is and, you know, what the onerous burdens

21   put in place were, and I think that really highlights the

22   problems with the deficiency of the indictment as drafted.

23              THE COURT:  All right.

24              MR. BUCKLEY:  And our point is that if we then take

25   for purposes of this motion, assuming the truth of the

33

1   allegations in the complaint to inform that, that they don't

2   state a claim.

3         We touched upon the <u>Headley</u> case from the Ninth

4   Circuit which we submit really outlines the difference here

5   about how even in spite of the existence of onerous

6   conditions, that there need be a causal nexus between those

7   conditions and the purportedly forced labor, and that other

8   items like the ability for people to lead, the sophistication

9   of individuals, when considered in light of the purpose of the

10  statute here, that that puts the government in a position

11  where even taking those allegations of the complaint, they

12  cannot state a claim.

13        Again, with regard to that, the government doesn't

14  address any of those arguments in its opposition brief.

15  Instead, it falls back on the pleading standards and says even

16  though in the first breadth to resuscitate our indictment,

17  we're going to ask you to take a look at the complaint with

18  respect to failure to state a claim, you have to take as true

19  the unsubstantiated and insufficiently pled allegations of the

20  indictment, but don't consider the complaint.  Respectfully,

21  Judge, we think that they have now presented the complaint as

22  a proffer of the facts and that you are permitted to consider

23  it in resolving that motion.

24        THE COURT:  Thank you.  Anything else?

25        MR. BUCKLEY:  The only other point I would make,

34

1    Judge, is that the TVPA, the Trafficking Victims Protection

2    Act as applied here is unconstitutionally vague.  As I

3    indicated at the outset, it was designed --

4           THE COURT:  Didn't somebody come to that conclusion

5    that it is unconstitutionally vague?  Who was that, another

6    court?  Isn't there a court that came to that conclusion?

7           MR. BUCKLEY:  There is not a court that came to that

8    conclusion.  A constitutional challenge was mounted in the

9    Estrada-Tepal case here in the Eastern District of New York.

10   That court did not feel it necessary to reach the

11   constitutional challenge finding that the --

12          THE COURT:  Who was the judge in that case?

13          MR. BUCKLEY:  That was Judge Brodie, Your Honor.

14          THE COURT:  Judge Brodie.

15          MR. BUCKLEY:  Yes.  The court did not find it

16   necessary to reach that constitutional issue.

17          While noting the significant overbreadth of the

18   statute, given the generic terms that are used in this

19   statute, Judge Brodie nevertheless said that I don't need to

20   reach that issue because the conduct alleged here falls so

21   clearly within the heartland of the conduct that form the

22   basis of prior criminal prosecutions, that I don't need to go

23   there.  Footnote 7 in the Estrada-Tepal case is where

24   Judge Brodie lists all the criminal prosecutions.  When you

25   look at those prior criminal prosecutions, they are so far

1  removed from the set of facts that we have here and when those

2  prior prosecutions are considered in conjunction with the

3  legislative history and the stated purpose of the TVPA, there

4  is nothing that would have put an individual like Ms. Mack on

5  notice that her conduct potentially could violate the TVPA,

6  let alone subject her to a potential mandatory minimum

7  sentence of 15 years or a maximum of life.

8              THE COURT:  I will look at it.

9              MR. BUCKLEY:  So unless Your Honor has any other

10  questions --

11             THE COURT:  Thank you very much.

12             Anything from the government on any of those points

13  briefly?

14             MS. HAJJAR:  I'll be very brief, Your Honor.

15             THE COURT:  Okay.  Thank you.

16             MS. HAJJAR:  Mr. Buckley's arguments suffer from the

17  same inconsistency that AUSA Trowel just noted which is that

18  the complaints about the deficiency of the pleadings in the

19  indictment are belied by the simultaneous argument that the

20  government has made a full proffer of the facts it intends,

21  the evidence it intends to adduce at trial and that the

22  charges fail to state a claim.

23             The government hasn't made such a proffer,

24  Your Honor.  Defense counsel's brief is filled with phrases

25  like "the complaint shows" and "the government's theory is X"

36

1   and the complaint shows that no one in DOS would have felt

2   compelled to stay due to threat of disclosure of collateral,

3   that's on page 17 of Allison Mack's brief, and all of those

4   arguments underscore how inappropriate this inquiry is at this

5   stage of the proceedings, to assess the viability of the

6   forced labor or sex trafficking charges prior to any evidence

7   being presented in this case.

8           The defendants -- all of the cases cited by

9   defendants have assessed these claims after, at a motion for

10  summary judgment as the Court has noted or after a trial,

11  after a conviction, after the facts in the record have been

12  established.  And as that's not done -- as the Court is not

13  able to assess what those facts are and the government has not

14  made a full proffer of the facts of the evidence to be adduced

15  at trial, it's simply inappropriate at this stage.

16          Your Honor, unless the Court has any questions --

17          THE COURT:  Well, the question is the sufficiency of

18  the allegations in the indictment regarding let's take forced

19  labor.

20          On what basis does the government believe that there

21  is sufficient, that the grand jury was able to reach or have

22  sufficient information which is reflected in the indictment in

23  order to indict the defendant for forced labor conspiracy?

24          MS. HAJJAR:  Your Honor, the --

25          THE COURT:  This is a recurring argument on the part

37

1    of the defense, that bare bones doesn't mean no bones, in

2    effect, that there has to be more there, that in order for the

3    defense to be able to provide an effective defense, the

4    government has to, in the indictment, provide more

5    information.

6        MS. HAJJAR:  Your Honor, and the government has

7    addressed that argument, that the language of the statute is

8    sufficient to give the defendants notice and tracks the

9    language in the appropriate way of the statutes as charged.

10       As to the defendants' heightened, arguments

11   regarding heightened pleadings, I believe Mr. Trowel has an

12   argument because it recurs in the brief about that that he'll

13   make to Your Honor, but the allegations in the indictment are

14   sufficient to -- they are not bare bones.  They give the

15   defendants fair notice of what they're being charged with and

16   that's only underscored by the fact that the defendants then

17   say we have, we understand exactly what the defendants, the

18   government has charged us with and that fails to state a claim

19   for these reasons.  The defendants have an understanding of

20   what it is that the factual allegations that underlie the sex

21   trafficking and forced labor charges in this case.

22       THE COURT:  Well, what is meant by "labor and

23   services" in the context of this case?

24       MS. HAJJAR:  Your Honor, the courts have been very

25   clear that labor and services need not be economic and the

1    government cited <u>Kaufman</u> which is one --

2              THE COURT:  I mean, going to Dunkin' Donuts and

3    picking up some coffee and doughnuts for the folks that

4    actively house, is that labor and services for purposes of a

5    forced labor conspiracy?

6              MS. HAJJAR:  Your Honor, it might be.  We don't have

7    the facts here.  We have no witnesses testify about what it is

8    she did as a DOS slave in this case and that's where we are,

9    fundamentally, the tension that we have.  We're assessing

10   these arguments at this stage of the proceeding.  The

11   government has set forth some examples on which it intends, of

12   the evidence it expects to adduce at trial but that's not a

13   full proffer of all the evidence it expects to put forth,

14   Your Honor.

15             THE COURT:  All right.  Anything else?  That's it?

16             MS. HAJJAR:  No, Your Honor.

17             THE COURT:  All right.  Let's move on to the issue

18   of identity theft.

19             MR. BUCKLEY:  Your Honor?

20             THE COURT:  I'm sorry.  Mr. Buckley, did you want to

21   add something very briefly?

22             MR. BUCKLEY:  No, Judge.  I was just going to ask if

23   it would be permissible for Ms. Mack to be excused just for a

24   couple of minutes to step outside.

25             THE COURT:  All right.  Why don't we take a

1    two-minute break.

2            MR. BUCKLEY:  Thank you, Judge.

3            THE COURT:  I want her here for the whole

4    discussion.

5            Did I see you in the cafeteria this morning,

6    Ms. Mack?

7            DEFENDANT MACK:  No, sir.

8            THE COURT:  Were you in the cafeteria?

9            DEFENDANT MACK:  No, sir.

10           THE COURT:  Okay.  I just wanted to make sure.

11           Okay.  I will wait here.

12           DEFENDANT MACK:  Thank you.

13           THE COURT:  I'm counting the minutes.

14           (Recess taken.)

15           THE COURT:  All right.

16           MR. BUCKLEY:  Thank you.

17           THE COURT:  Let me just check.  Do we still have our

18   telephone contact?

19           MR. STERN:  Yes, Your Honor, we're still here.

20   Thank you.

21           THE COURT:  All right.  Thank you very much.  Just

22   checking.

23           (Continued on next page.)

24

25

Proceedings                                              40

1   (continuing.)

2          THE COURT:  All right.  Now, Ms. Shapiro, you are

3   going to speak to two other issues, right; the identity theft

4   issue?

5          MS. SHAPIRO:  Correct.

6          THE COURT:  And the inducing illegal entry and

7   identity theft?

8          MS. SHAPIRO:  Correct, Your Honor.

9          THE COURT:  Can you do that now?

10          MS. SHAPIRO:  Yes, sure.

11          THE COURT:  Thank you.

12          MS. SHAPIRO:  With respect to the identity theft, I

13   covered it a little bit in my earlier presentation.  I just

14   want to respond to the Government's argument and make one

15   other, I think, important point.

16          THE COURT:  Go ahead.

17          MS. SHAPIRO:  First, you know, the Government keeps

18   saying in its brief and here that there is no need to specify

19   which particular subsection, which specific offenses is

20   required.  And the fact of the matter is there are cases

21   clearly holding that that is required which we've cited and

22   which they continue not to respond to.  We have the *Thompson*

23   and *Awan* cases from this district and I want to highlight a

24   little bit *Awan* because there one of the underlying offenses

25   where the Court found the indictment insufficient was murder

Proceedings                                                          41

1   and the Court said you had to specify whether it was first

2   degree or second degree murder.

3           Here we have six different types of provisions under

4   1324, the immigration offense that's incorporated by reference

5   in some of the identity theft.  And it just makes no sense to

6   say that they can just sort of generally allege that the grand

7   jury didn't have to find -- even if they think they could

8   prove all of those offenses, they have to be specific and we

9   have to have assurance that that's what the grand jury found.

10          In that regard, to the extent that the Government is

11  focused on notice, they keep ignoring the fact that there are

12  two purposes behind -- and two different constitutional

13  provisions we're talking about.  One is the notice provision

14  and maybe to the extent that as to that they're claiming the

15  discovery helps, that doesn't cure a problem or defect in the

16  grand jury which is a completely separate issue and which

17  courts have repeatedly said has to be considered separately

18  and that discovery doesn't cure; starting with the *Russell*

19  case by the Supreme Court and numerous others.

20          The other set of cases that support our argument

21  that the specific provisions of these incorporated statutes

22  have to be cited include the Third Circuit case and the DC

23  Circuit case which we've cited, including in our reply brief

24  in page four, footnote four, which they never responded to and

25  then the last thing in terms of the case law which I want to

Proceedings                                    42

1   reiterate, and I know I mentioned this earlier, but the
2   Government is relying heavily on, for example, *Appling* and
3   *Glecier*, the Second Circuit case, and those cases as I
4   mentioned earlier, you know, specifically say that the
5   identified pattern of racketeering activity, even if the type
6   of crime is sufficient that it has to be the type of crime
7   under specified provisions of the criminal code.  And that's
8   just not met here with respect to the identity theft acts at
9   all.

10       The other thing I wanted to point out is that both
11   racketeering act tenable as it is and Count Seven, which I
12   know we've got the venue argument but there's a substantive
13   problem with it as well, those counts charge Ms. Bronfman with
14   identity theft supposedly in connection with a tax evasion
15   offense under 26-USC-7201 and I think -- but there's no
16   specification of the elements and there's no indication from
17   which we could be confident that the grand jury understood
18   what the elements of tax evasion are.

19       And the reason that's particularly critical with
20   respect to that racketeering act and that count, is that the
21   identity theft had to have been committed essentially with the
22   knowledge and intent to further the tax evasion offense and
23   7201 has an extremely high standards of scienter.  It's the
24   highest level in the law under *Cheek versus United States*.  To
25   be guilty of tax evasion, you have to violate a known legal

Proceedings                                          43

1    duty willfully.  In other words, the defendant has to know the

2    tax law and know that they're violating it.  And, so -- and

3    the identity theft statute therefore requires a showing both

4    to the grand jury to find probable cause and to any trial jury

5    that the defendant had to understand that any identity theft

6    was in furtherance of an actual violation of the tax law and

7    that the defendant understood that.  And I think that is

8    absolutely critical and points out the deficiencies in the

9    Government's theory.  Unless the Court has further questions

10   on that, I will turn to the immigration.

11              With respect to the immigration offense, you know,

12   we obviously pointed the Court to the Ninth Circuit opinion.

13   I just -- and I think our letter is fairly clear but I do just

14   want to highlight that we have really three different

15   arguments.  The first argument which relies on the Ninth

16   Circuit case, which agrees with our position is that this

17   statute is unconstitutionally overbroad because of the risk of

18   chilling protected speech and we gave some examples.  There

19   are some examples in the Ninth Circuit's well-written and

20   persuasive opinion --

21              THE COURT:  And the Ninth Circuit is considering it

22   en banc; is that it?

23              MS. SHAPIRO:  My understanding from the Government's

24   briefing is that the Government is considering petitioning for

25   en banc.

Proceedings                                              44

1        THE COURT:  That may be a long time in coming.

2        MS. SHAPIRO:  Exactly, Your Honor, and I think this

3    court has to address this issue.  It's before you.  We have a

4    trial coming up and who knows what the Ninth Circuit would do.

5        THE COURT:  And who knows what the Second Circuit

6    would do, were it to get that far.

7        MS. SHAPIRO:  Clearly none of that is binding on

8    Your Honor.  We do think the Ninth Circuit's panel opinion is

9    persuasive and that the Court should agree with it.

10       THE COURT:  Okay.  I understand.  I understand the

11   point.  I know about the case.

12       MS. SHAPIRO:  I just -- if I could say one more

13   thing which is that we made two other arguments that the Ninth

14   Circuit panel didn't address that we think there are

15   additional problems with the statute.  These are in our

16   letter.  One is that the statute is vague and doesn't provide

17   notice because it's unclear what encouragers or inducers could

18   extend to and the other one is that, putting aside the

19   overbreadth argument, the statute violates the First Amendment

20   because it's content discriminatory.

21       THE COURT:  Yes, I saw that all.

22       MS. SHAPIRO:  Yes, yes.  Thank you, Your Honor.  I

23   didn't mean to waste your time.

24       THE COURT:  No, no, you are not.  It is good to

25   hear.  I appreciate it.

SN        OCR        RPR

Proceedings                                    45

1          Okay.  Does the Government have anything to add?

2          MR. TROWEL:  Yes, Your Honor.  On the racketeering

3    acts and alleged identity theft and money laundering, I think

4    many of the issues we've already discussed insofar as we've

5    discussed.  Those cross references, and I think this is what

6    distinguishes *Thompson*, *Awan* and other cases, those cross

7    references are not elements.  The element is the intent to

8    commit the crime, the top-level crime, with the intent to aid

9    and abet, commit or in connection with another crime.  That's

10   the element.  These are means.

11         And Your Honor I am sure will think to himself, I've

12   never seen an indictment that alleges the elements of the

13   cross-referenced crime.  That's because these are not

14   essential elements of the alleged crime.  The indictment in

15   Thompson, the counts that were dismissed, they were dismissed

16   because the indictment said at Count Eleven of the *Thompson*

17   indictment.  It says, Any sexual activity for which a person

18   could be charged with a criminal offense.

19         That would be akin to the Government here having

20   left off the citation to 1324 entirely and just said, another

21   violation of federal law.  We haven't done that.  What we've

22   done here is identified the essential element, which is that

23   intent element, and then we've offered the means by which the

24   defendants are alleged to have committed that element.  Those

25   means were not limited to a single subparagraph.  The jury

Proceedings                                              46

1    doesn't need to be unanimous as to that subparagraph and

2    *Thompson* and *Awan* are simply unrelated to that point.  In

3    *Awan*, for that matter, the issue there was the nature of

4    alleged material support.  Not only is that an element.  It is

5    the core element of the statute at issue.

6            Here, first we have the RICO conspiracy.  That's

7    actually the charged crime.  We have the second-level

8    racketeering act and then the third level.  There is no

9    authority, you would think in 50 years of RICO case law that

10   if there was a Constitutional or a rule-based reason that the

11   Government had to allege with additional specificity those

12   cross-references or the elements of those crimes there would

13   be a case anywhere that required that.  There is none and the

14   reason is that it's not required by law.

15           On the Ninth Circuit case, I think -- I want to be

16   clear about what the Government has asked for here.

17           THE COURT:  Here or there?

18           MR. TROWEL:  Here.  It's understood that the en banc

19   process could take some time.  And the government is not

20   requesting that the Court simply wait for the Ninth Circuit to

21   revisit the decision, but as I'm sure Your Honor is aware the

22   requesting en banc means that the SG's office is involved.

23           THE COURT:  That is why it takes so long.  It

24   doesn't guarantee that the SG's office -- if they can find

25   someone over there right now, that the SG's office is going to

Proceedings                                    47

1    authorize an application for an en banc.

2              MR. TROWEL:  Correct.

3              THE COURT:  So that leaves me --

4              MR. TROWEL:  Yes.  And here's --

5              THE COURT:  -- to decide this weighty constitutional

6    issue without two more judges to help me.  Do you think that's

7    fair?

8              MR. TROWEL:  I don't, Your Honor.

9              THE COURT:  Thank you.

10             MR. TROWEL:  The Government understands that there

11   will be a decision on the -- an internal government decision

12   on the petition this week.  So all the Government is hoping to

13   avoid is an inconsistent position.  There is some possibility,

14   of course, that the Government's position may in some respect

15   or another, and when I say the Government I mean the SG main

16   justice, may benefit them.  I don't know the answer to that.

17   What I think the Government is asking for here is just time to

18   understand what the Government writ large, what our position

19   is so we can be consistent here and there.

20             THE COURT:  And they will tell you they know about

21   this case?

22             MR. TROWEL:  Yes.  I have made them aware and we're

23   in touch with them, yes.

24             THE COURT:  So you will let me know and everybody

25   else?

Proceedings                                    48

1          MR. TROWEL:  Yes.  And there's an added point here.

2     I think the defendants are almost suggesting that their letter

3     should have warranted a full response from the Government.

4     This matter isn't briefed.  This was not apparent to the

5     defendants in formulating their own motions to dismiss.  I

6     think that alone suggests that reasonable minds can differ on

7     it.  It was not immediately apparent to them and it wasn't

8     included in their brief.

9          So we haven't had an opportunity to respond to their

10    full discussion of the issue, how it would relate to in fact

11    this Thompson case on appeal where the Second Circuit

12    addressed a similar issue.  So I think --

13         THE COURT:  The solicitor general could decide to

14    appeal.

15         MR. TROWEL:  He could and all --

16         THE COURT:  Petition for cert.  If they think that

17    it would be better simply to go up, they would let you know

18    that, too.

19         MR. TROWEL:  Yes.  I'm not asking to wait for

20    resolution.  I'm just asking for the Government to understand

21    so we can understand the position.

22         THE COURT:  I see.

23         MR. TROWEL:  Thank you, Your Honor.

24         THE COURT:  All right.  Okay.  Let's move on.  On

25    the state law extortion issue, Mr. Diaz?

Proceedings                                           49

1           MR. DIAZ:  Your Honor, when we initially reviewed

2    the superseding indictment, specifically to the state law

3    extortion in this case, we were left wanting more in terms of

4    more details of how Ms. Salzman induced fear to these

5    so-called lower-level DOS members.  What were the alleged

6    secrets that would be exposed that would subject them to

7    hatred and ridicule and that would essentially serve as the

8    basis to obtain property.

9           The pattern of racketeering activity to establish

10   RICO conspiracy would be established through -- through the

11   pled racketeering acts which the Government chose to detail in

12   the indictment.  The Fifth and Sixth Amendment which we stated

13   to or cited to in our briefing does not accept RICO cases,

14   RICO conspiracy cases, and requires adequate notice of the

15   charges and protection against charges not based on evidence

16   presented to the grand jury.

17          Essentially, Your Honor, Ms. Salzman should not have

18   to guess in terms or make assumptions as to the charged

19   conduct and/or the nature of the acts presented to the grand

20   jury.

21          Now, our specific -- our specific challenge are to

22   the Racketeering Act 7 and Racketeering Act 9(b) of the

23   indictment and those are the state law extortion and

24   essentially just briefly, Your Honor, the -- they essentially

25   track in the indictment the statute which is that as to

Proceedings                                              50

1    Racketeering Act 7 that Ms. Mack, Mr. Raniere and Ms. Salzman

2    sold property by inducing fear that if such property would not

3    be given, Lauren Salzman and her co-defendants would expose

4    the secret that would subject lower-level DOS members to

5    ridicule, hatred, contempt and that the co-defendants would

6    perform an act that would not materially benefit them but that

7    was calculated to materially harm one or more persons.

8            Now, Act 9(b) which is, again, state law extortion

9    essentially mimics act 7, it's true, but now there's a

10   specific Jane Doe 6 that's mentioned in that act and that

11   applies to Ms. Salzman.  Your Honor, the extortion predicate

12   act has an implicit direct component, and I think the Court

13   may have alluded to this earlier in prior argument.  The cases

14   that we cite, while recognizing that they're not RICO

15   conspiracy cases.  And those are *Russell*, *Urso* and two state

16   law cases that specifically deal with extortion which are

17   *Keohane* and *Dioguardi*.  It's People v -- stands for the notion

18   that when you're dealing with a crime of extortion it's that

19   the defendant instilled fear in the alleged victim induced by

20   a threat in order to obtain this property.

21           Now, while not RICO conspiracy cases, we added these

22   cases to highlight the implies notice requirement pursuant to

23   the Sixth Amendment because it is a crime that involves a

24   threat and it's of a threat nature.  And critically missing

25   from the indictment as to these racketeering acts are, for

Proceedings                                          51

1    instance, the -- what was the nature of the secret?  What was

2    the nature of the threat?  What was the nature of the act that

3    the defendants were performing which would have caused

4    material harm.

5              And these are -- essentially we're left guessing in

6    terms of reviewing of the indictment and I know that the

7    Government indicates that in review of the other disclosures

8    made that we should be able to acquire it essentially and not

9    have to guess that they've met the notice requirement.

10             However, Your Honor, they don't explain and I think

11   we commented on that in our briefing that the nature of the

12   threat is not detailed and it is important. *Dioguardi*, which

13   we cited to indicates that the nature of the threat has

14   instilled more than subjective fear and it's not clear from

15   the statute that that is -- that that occurred.  The reason

16   that's important, I think the Court had alluded to this

17   earlier, is that there is big issue in terms of collateral and

18   whether the collateral stands as some type of coercive force

19   over these lower-level DOS members, especially when the

20   information and a lot of the discovery that has been provided

21   indicates that the collateral was voluntarily given.

22             THE COURT:  Let's put aside the issue with regard to

23   Count Seven and talk about just the racketeering act.  Is

24   there any case law that tells us that if the Government

25   chooses to plead a particular racketeering act of this nature

Proceedings                                                      52

1   that there is a requirement that the specifics be pled as

2   well?

3            MR. DIAZ:  Your Honor, I think the closest that we

4   come to that is probably just in terms of requiring that the

5   Fifth and Sixth Amendment should apply even when we're talking

6   about predicate acts and I think that's *Yanotti*.  I don't have

7   the specific cite.  That's as close as we're going to get in

8   that context.

9            THE COURT:  Thank you.

10           MR. DIAZ:  Your Honor, just briefly, in terms of the

11  Fifth and Sixth Amendment again they do require fair notice

12  and they require that Ms. Salzman be prosecuted based on

13  evidence presented to the grand jury.  Our assertion is that

14  in reviewing the indictment that that does not occur.

15           THE COURT:  Okay.

16           Anything from the Government on this one?

17           MR. TROWEL:  Yes.

18           THE COURT:  Go ahead.

19           MR. TROWEL:  Thank you, Your Honor.  I will note,

20  Your Honor, that the discussion that Mr. Diaz just had with

21  the Court involved a number of facts that are certainly not on

22  the record.  The same argument about this being premature

23  applies here and also the same arguments that I have made to

24  Your Honor about the nature of what is required in pleading a

25  RICO conspiracy applies here as well.

Proceedings                                           53

1          I would just note, as the Government cited in its

2   brief, that in *Bronson* the Government specifically alleged as

3   a predicate racketeering act to a RICO conspiracy, quote,

4   "acts involving extortion in violation of New York Penal Law

5   Section 155.35.  And that was challenged and upheld.  It's

6   well-settled.

7                THE COURT:  Thank you.

8                MR. TROWEL:  Thank you, Your Honor.

9                THE COURT:  On the bill of particulars -- I will

10  hear from defense.  You know, with regard to the pattern of

11  RICO element, it is clear that the *Reich* case.  It was a civil

12  case, was it not, sir?

13               MR. THAYAMBALLI:  That's right, Your Honor.

14               THE COURT:  And the Supreme Court has made it pretty

15  clear that there are differences between the consideration of

16  the analysis that takes place in a civil as opposed to a

17  criminal case with regard to RICO.  In fact, I was down there

18  for the argument in my case involving the European community

19  and the Solicitor General got up and made it very clear that

20  some of these considerations in civil RICO should not spill

21  over into the criminal side.

22          So how is a decision on this subject that you

23  mentioned, a pattern, relevant in a civil context relevant to

24  the criminal context?

25               MR. THAYAMBALLI:  Your Honor, to summarize, the

SN        OCR        RPR

Proceedings                                                    54

1    answer is that it's true that in the civil context there are

2    some considerations that don't apply in criminal cases.  The

3    plaintiff has to show RICO standing and RICO injury.  The

4    Government doesn't have to do that in a criminal case, but the

5    pattern of racketeering activity is an element of the RICO

6    statute that applies in both.

7         It is a part of the RICO statute that a plaintiff

8    has to show in a civil case, the Government has to indict --

9    has to show the indictment in a criminal case.  That's a

10   statutory term that applies in both the civil and the criminal

11   context.  It has to be applied consistently in both of those

12   contexts.  The term can't morph meanings depending on whether

13   it's a civil plaintiff or the Government.

14        THE COURT:  But the question is whether what the

15   Government has done here is enough to meet the standard in a

16   criminal context under Supreme Court case law and Second

17   Circuit case law.  I can't ignore the case law just because,

18   you know, it's one word, it's one statute.  But, frankly, it

19   is analyzed separately oftentimes in the criminal context as

20   opposed to the civil context.  Wouldn't you agree with that?

21        MR. THAYAMBALLI:  Your Honor, I think the key point

22   to keep in mind is that we're citing RICO primarily in order

23   to explain what a pattern is and that is true in -- the

24   analysis of RICO is true in both civil and criminal cases.

25   That's why RICO cites criminal cases and why the Government in

Proceedings                                               55

1    its brief cites criminal cases that cite civil Supreme Court

2    cases.  The question of statutory interpretation that RICO

3    answers does squarely apply here.

4              THE COURT:  Thank you very much.

5              MR. THAYAMBALLI:  I will also be addressing the bill

6    of particulars.

7              THE COURT:  Quickly.  I'm sure everyone wants a

8    shots at the bill of particulars.  Go ahead as long as you are

9    up.  Go ahead.

10             MR. THAYAMBALLI:  It relates to the underlying

11   offenses, cross-reference statutes argument that Ms. Shapiro

12   was discussing.  As she explained, the lack of specificity in

13   the indictment as to those cross-referenced statutes is a

14   reason to dismiss the indictment.  But in the alternative,

15   it's a reason to provide -- to require the Government to

16   provide a bill of particulars specifying those statutory

17   sections.

18             If we don't know the legal basis for the charges

19   against our clients, we can't adequately prepare a defense.

20   I mean, the legal basis for the charges informs pretrial

21   motions, the evidence put on at trial, requests to charge and

22   things of that nature.  I wanted to address one point related

23   to that.  Mr. Trowel said, well, the government doesn't have

24   to convince a jury to find a particular underlying offense

25   unanimously beyond a reasonable doubt.  That's simply is not

Proceedings                                               56

1    true.

2                 If Your Honor looks to the analysis context of

3    Section 371, conspiracy -- a conspiracy to commit an offense

4    against the United States, the statute just says it's a crime

5    to commit a conspiracy against the United States.  There's

6    therefore a whole host of cross-referenced statutes.

7                 The jury does have to find the object of the

8    conspiracy, the object offense beyond a reasonable doubt and

9    so it's no answer to say that the Government can simply allege

10   that the defendants had something bad in mind and that's

11   enough to convict them.

12                THE COURT:  Thank you very much.

13                Who else would like to speak to the issue of the

14   bill of particulars?  Anyone on defense side?  I have your

15   submissions so anything from the Government on the bill of

16   particulars issue that hasn't already been provided in writing

17   to the Court.

18                Mr. Trowel.

19                MR. TROWEL:  Unless you have any specific questions,

20   Your Honor.

21                THE COURT:  I do not.

22                MR. TROWEL:  Thank you.

23                THE COURT:  At this point on the Brady issue -- yes,

24   Mr. Agnifilo, please.

25                MR. AGNIFILO:  Thank you.  So we don't know any of

Proceedings                                                      57

1    the specifics which is why it's a Brady issue, but I have

2    reason to believe that some number of women in DOS, 2, 5, 7,

3    20 have been interviewed by the Government.  Maybe they've

4    been across the street at the U.S. Attorney's Office and have

5    essentially soundly debunked the Government's core theories as

6    to sex trafficking and forced labor.

7              I think -- in particular I think things that they

8    might have said to the Government is that DOS has nothing to

9    do with sex.  It has nothing to do with recruiting women for

10   the purposes of sex which is one of the specific allegations

11   in the indictment as to the methods and means of the

12   racketeering conspiracy and we've been beating this drum

13   soundly and repeatedly since June.  We gave the Government a

14   letter with specific Brady requests in July.  We've raised it

15   in various forms to the Court and the Government says they

16   know their Brady obligations and they have no Brady material.

17   Sometimes that's fine and that's accepted and we accept that

18   in 95 percent of the cases and we walk away.

19             Here, I don't think it's an acceptable answer.  I

20   think they know very well the women in DOS who have said

21   things along those lines and I think they've cobbled together

22   a theory as to how it's not Brady and they will talk to their

23   theory, but I think but they will say something along the

24   lines of, well, just because it didn't happen with everybody

25   doesn't mean it didn't happen.  The problem, though, is that

Proceedings                                          58

1   there are two wide-open conspiracy counts in this indictment.

2   There's a sex trafficking conspiracy count that's Count Four

3   that's not specific to any particular Jane Doe and there is a

4   wire fraud conspiracy count, that's Count Three, that

5   basically says that lower level DOS members were deceived when

6   they joined DOS because to their shock and amazement Keith

7   Raniere had something to do with DOS and they were defrauded

8   and I think on that point I think they've received information

9   from women in DOS that wasn't a form of deception, they

10  weren't deceived.

11          And so my concern is that they have Brady material.

12  This trial is starting I hope, I hope -- I have rearranged my

13  life for March 18th with opening statements.

14          THE COURT:  Do not hope.  It is happening on March

15  18th.  We will get to the scheduling piece of this.  You know,

16  I have a whole agenda here.  Don't move into scheduling.

17  Let's talk about Brady.  Your job is to talk about Brady.

18          MR. AGNIFILO:  Thank you, Judge.  So I have a

19  proposed solution to this problem.  One of the most productive

20  things that have happened in this case and she might look at

21  me funny when I walk into her courtroom because I'm invoking

22  her name is Your Honor gave certain things to Judge Scanlon to

23  do in this case and she has been wonderful.  She has been on

24  top of this.  She has been diligent.  She has understood the

25  details and the nitty-gritty.

1          My proposal is that the Government is in possession

2     of 302 reports or interview reports of one form or fashion of

3     women that have said they're in DOS.  I am venturing to say,

4     and I have not seen any of these reports of course, that some

5     of these women have said I wasn't in the least bit deceived by

6     joining DOS.  It was good for me.  It gave me what I wanted.

7     It satisfied the reasons I joined for.  It had nothing to do

8     with sex with Raniere.  I didn't feel coerced.  And the

9     fundamental premise of the Government's core theory when it

10    comes to sex trafficking and forced labor and also this part

11    of the wire fraud count is not true from my perception.

12          And, to jump the gun because I think it might save

13    time, I have seen these arguments before and often the

14    argument is just because he didn't rob every bank didn't mean

15    he didn't rob those banks.  And they're going to say, well, it

16    could have been sex trafficking as to her, but not her.  But

17    that's not -- that's not their core theory.  That is not

18    certainly what they've said in court.  That's not what they

19    said in the detention memos and if I may slightly bring up

20    another topic, I don't think that's really the crux of their

21    argument to keep Mr. Raniere in jail all of this time; that

22    it's sporadic one here, one here, one here.

23          They have basically alleged that DOS is a -- it's

24    not a criminal enterprise because the enterprise here is not

25    DOS, but is a criminal instrument and that's what they said.

Proceedings                                                      60

1    In their complaint they said that DOS was a criminal

2    enterprise.  They said those words so their view is not that

3    this is one here, one here, one here.  Their view is that this

4    is an ongoing conspiracy of the nature that they charged in

5    Count Four and the reason it's Brady is because there are

6    witnesses, people who would have been sex trafficked, been

7    subject to forced labor who are saying that didn't happen and

8    we could --

9                THE COURT:  That didn't happen to me.

10               MR. AGNIFILO:  It didn't happen to me so here is the

11   analogy I would like to draw.  If you had a drug conspiracy

12   and if there were a person that might be in the heartland of

13   that drug conspiracy.  They worked with someone who was

14   alleged to be the head drug dealer and they were supposed to

15   be a drug dealer too.  They came to the Government and said,

16   we're not dealing drugs.  We're making money from sports

17   gambling.  There's no drugs in this conspiracy.  That's Brady.

18   That's Brady.  And this is like that and so I think they are

19   sitting on Brady material.  I think they're trying to cobble

20   together a theory.

21               One of the big problems we're talking about today

22   and in general is there are shifting sands in this case making

23   a lot of senior, experienced, graying defense lawyers kind of

24   uncomfortable.  It seems as if things are always shifting.  We

25   might get a superseding indictment, we might not.  It might be

SN      OCR      RPR

Proceedings                                              61

1   sex trafficking for one person or ten people.  We're trying to

2   figure out what's going on here, but what I'm pretty sure I

3   know is that women have gone in and spoken to my colleagues,

4   who are respected and admired.  None of this is personal.  I'm

5   trying to get the data and evidence; that this didn't that to

6   them and, therefore --

7           THE COURT:  Okay, I understand what you're saying,

8   the first and second time.  The third time I don't need.  I

9   got the picture.  Could I ask them?  Could I ask them to

10  respond?

11          MR. AGNIFILO:  Of course.

12          THE COURT:  Do you know what the question is or do I

13  have to articulate question here?

14          MS. PENZA:  If you have a specific question --

15          THE COURT:  I have Mr. Agnifilo's question as to why

16  denials by people you interview who claim to have been or you

17  believed were members of DOS, whether their denial or their

18  statement that DOS was just a club and that nothing bad --

19  there was nothing bad about it whatsoever and they didn't

20  force me to do anything that I didn't want to do, why wouldn't

21  that be Brady material for purposes of this case?

22          MS. PENZA:  Your Honor, first of all, the statement

23  you just made is not a statement in our possession and not one

24  that --

25          THE COURT:  I do not know what's in your possession.

Proceedings                                                    62

1    That's just a tip.  I am not saying that that's the only

2    statement.  You know, we can make a list of 100 statements

3    that would fit Mr. Agnifilo's definition of Brady material in

4    this context.  This is just one possible statement.

5              MS. PENZA:  Understood, but I think it goes to one

6    of the main issues here which is that what this is is an end

7    run around the requirements of 3500 and our practice in this

8    district.  Every single person who is in DOS or was in DOS who

9    the Government has interviewed is a potential government

10   witness and we intend to provide 3500 material at the

11   appropriate time.  In addition to that, Your Honor, we are

12   willing to make a commitment that we will provide statements

13   as to every person we have interviewed who is in DOS as if

14   they were going to be a witness in our case in chief because

15   we believe that they might be based on what these witnesses

16   have told us about their experiences in DOS.  That is, Your

17   Honor, what we think the problem is here.

18             THE COURT:  When are you going to provide this 3500

19   material?  That's the next question.

20             MS. PENZA:  Your Honor, we have a very compressed

21   trial schedule and we believe two weeks prior to trial would

22   be appropriate.

23             THE COURT:  And whether this material -- you know,

24   that's all fine and good, but what about the issue of whether

25   some of this of material may constitute exculpatory evidence?

Proceedings                                                  63

1    I think that's really what Mr. Agnifilo is talking about here.

2            MS. PENZA:  Your Honor, what we would say to that is

3    while we do not believe that there is exculpatory material

4    here, the question in all of the Brady cases isn't could this

5    assist the defendant.  It's are they being denied exculpatory

6    evidence that's preventing them from adequately preparing for

7    trial and that's simply not the case here.  The defendants

8    know every person who is in DOS.  They are perfectly capable

9    of interviewing those people.

10           They, from their very statements to Your Honor, are

11   clearly having conversations with certain people who the

12   Government has also interviewed and so there is no loss to the

13   defendants that the courts are concerned about in the Brady

14   context that the defendants are going to be unfairly surprised

15   at trial or not have had the proper opportunity to be

16   preparing their defense.  This is not -- the Government

17   doesn't need to be doing the Pretrial investigation for

18   competent defense counsel who are sitting there and they know

19   everybody who was involved and they are equally able to

20   interview people.  And, so, that's what the Government's

21   position is.  If the Court has any other questions, we're

22   happy to address them.

23           THE COURT:  No.  Thank you.

24           Mr. Trowel, the comment about the comparison of

25   civil and criminal pleading standards and RICO cases, is there

Proceedings                                                    64

1    anything you would like to comment with regard to that?  I am

2    sure you faced that issue before.

3              MR. TROWEL:  Sure.  I think, Your Honor, there may

4    be civil cases that are relevant at a certain point of this

5    proceeding.  Post trial there may be briefing looking to civil

6    cases for a description of the pattern that proof is required

7    to establish pattern.  The point the Government made in its

8    brief is that we're at the motion to dismiss stage and even

9    though I think the defendants' brief suggests that there is no

10   difference in the Court's analysis at the motion to dismiss

11   stage of an indictment in a civil complaint, plainly that's

12   not true.  There's a grand jury here who has returned an

13   indictment and as the Supreme Court said in *Costello*, in

14   general that's enough to warrant trial.  The motion to dismiss

15   standard is quite different and for that reason those cases

16   are inapplicable here.

17             THE COURT:  All right.  Thank you.  At this point

18   let me go over the issue of the jury selection, if I may.  I

19   take it that everyone is in agreement that the parties are

20   going to provide a questionnaire for potential jurors and I am

21   requiring that the parties provide agreed-to questions and

22   objected-to questions by February 11th so that we can get jury

23   selection moving to accommodate Mr. Agnifilo's very busy trial

24   schedule elsewhere.

25             MR. AGNIFILO:  Thank you, Judge.

SN        OCR        RPR

Proceedings                                                    65

1          THE COURT:  You are welcome.  And then we will meet.

2   Once I have that material, we will have a meeting and let's

3   try to narrow it down.  I am going to order up 500 jurors to

4   fill out questionnaires.  They will -- they will be here on

5   the following dates:  March 5th and March 6th.  That's a

6   Tuesday and a Wednesday; 250 on Tuesday, 250 on Wednesday at 2

7   p.m.  And everyone will have to be present, all the

8   defendants, counsel.  If there are three lawyers representing

9   one individual, it won't be necessary for all three of you to

10  come.

11          One or more should be here because the defendants

12  will be introduced to the jurors and obviously the purpose of

13  that is to make sure that the jurors, potential jurors, do not

14  recognize any of you, either counsel or defendant.  And we'll

15  list the additional lawyers on the Exhibit A to the

16  questionnaire so they can review the names of the lawyers who

17  aren't there on those dates.

18

19          (Continued on the following page.)

20

21

22

23

24

25

66

1          THE COURT:  (Continuing)  The government will be

2    required to make copies or arrange to make copies so that all

3    counsel receive them.

4          Then on March 12th, once I have a list of the jurors

5    who have not been struck by consent, we will start calling in

6    jurors for the interview.  So we will interview potential

7    jurors beginning at 9:30 on March 12th and continuing until we

8    get somewhere in the range of 45 or 46 acceptable jurors from

9    whom we will select the 12 jurors and 6 alternates.  The final

10   jury selection will be on the morning of March 18th before

11   opening statements.

12         Any questions about that schedule?

13         Let me ask this.  I would like your opinion as to

14   whether we should have trial on Fridays and if anyone has any

15   thoughts on that.  I can do four days a week, possibly five.

16   I generally prefer a four-day a week schedule, but if there's

17   any good reason why we ought to add a day, I had like to hear

18   it from you now so that we can plan our schedule in late March

19   and April, possibly May.

20         MR. AGNIFILO:  I'm trying to get a facial read

21   consensus.

22         THE COURT:  Well, you can go around the room too.

23         MR. AGNIFILO:  That's probably more effective.

24         MS. PENZA:  The government has no objections.

25         MR. AGNIFILO:  I think we're all good with Fridays

67

1   off.

2           THE COURT:  Fridays off?

3           MR. AGNIFILO:  Yes.

4           MS. PENZA:  And that's fine with the government.

5           THE COURT:  And how long do you think in terms of

6   days the government's case will last assuming most, if not

7   all, of the charges remain in play?

8           MS. PENZA:  Approximately 20 days, Your Honor.

9           THE COURT:  Twenty trial days?

10          MS. PENZA:  Yes.

11          THE COURT:  So we are basically talking about a five

12  week trial on the government's case and if we have a defense

13  case from any of the defendants, you will have to inform me

14  about that at the appropriate time.  That won't require that

15  you put on a case, but at least we can plan for putting on a

16  defense case and that would be very helpful.  It is

17  particularly important that I know this for the potential

18  jurors because once we move into April which we will, the

19  government's case will end just before the Christian and

20  Jewish holidays and we are going to have to take, I assume, a

21  number of days off for the holidays or we won't get a jury.

22  So that will bring us into May.  Then the question is how far

23  into May would we need to go.

24          I am just wondering if any party has thought about

25  that, you can at least give me some warning so that I will be

68

1   ready to entertain questions or at least make a statement to
2   the jurors when we meet with them in March.  Does anyone have
3   any thoughts on that?
4         I think I am going to have to tell the jurors, the
5   potential jurors when they fill out the questionnaires that
6   they should pay specific attention to the question or
7   questions about availability going into May.  There may be
8   people going on vacation over the religious holidays.  Maybe a
9   week, it could be two weeks they wouldn't be available.  If it
10  was a few days, that is something that we can adjust for.
11        So, Ms. Necheles, were you going to get up?
12        MS. NECHELES:  Your Honor, I hear your concern and I
13  would just ask if we could know how many witnesses the
14  government intends to call, it might give us a better sense
15  because I hear 20 trial days but I don't know what -- the
16  government often does not understand how long the process
17  might be.  And so, and so that, you know -- even though we may
18  not be calling witnesses on our case, you know, we try to
19  cross-examine, so if we could get a sense.
20        THE COURT:  That's a good point.
21        How many witnesses?  I am sure it is on the tip of
22  your tongue.  Yes, ma'am.
23        MS. PENZA:  Your Honor, we're not prepared to
24  identify how many witnesses we intend to call.
25        THE COURT:  Well, bear in mind that when we meet on

69

1    March 5th which would be the next meeting, after we have had

2    our discussion with the jurors and they then fill out the

3    questionnaires, we will meet back here and go over some of

4    these issues.  So perhaps the government will be in a better

5    position or willing to go into this issue and I will ask you,

6    the defense, also to go into the issue of what you anticipate

7    and by that time, we will have a decision on the motions and

8    we will be in a better situation to examine the length of the

9    case.

10            MS. NECHELES:  I understand, Your Honor.  Thank you.

11    My only concern, and I know Your Honor already knows this,

12    that one of the worst things that happens in a lengthy trial

13    is when it goes much longer than anticipated, the jurors get

14    upset and want to leave and it causes turmoil in the trial.

15            I understand the government doesn't want to be

16    committed to how many witnesses, but it's really almost

17    impossible for us to comment on the government's expected

18    length of the trial without giving us some idea.  So I'm not

19    trying to pin them down to anything.  I just -- and I think we

20    need to know this before we give the jurors the questionnaire

21    of what a realistic approximation is because it's awful to

22    have jurors start saying in the middle of a trial, and I know

23    Your Honor knows this, that you promised me X and I need to

24    leave, I have other commitments.

25            So that's the only reason I would press a little bit

70

1   if we could get some better number.  If the government is

2   calling five, yes, five, twenty days seems a lot.  If they're

3   talking about 20 witnesses, maybe not.  And so that's the only

4   thing I would ask.

5           Your Honor, just in terms of another date to meet

6   before March, we are going to ask that we meet before then,

7   again, to discuss maybe the severance motions and some other

8   issues on another date.

9           THE COURT:  Right.

10          MS. NECHELES:  But I don't need to raise that right

11  now.

12          THE COURT:  No, that's all right.  That's fine.

13          MS. NECHELES:  And the severance motions, we will be

14  filing we expect tonight ours and I think the government will

15  be filing in a week, and there's issues about timing and the

16  privilege issues that the government raised.  So we would ask

17  maybe in a week and half or two weeks to be able to meet with

18  Your Honor again.

19          THE COURT:  I think there is an issue about pushing

20  back the date for all the motions by two days and the defense,

21  some of the defense lawyers have objected.  Is that right?

22          MS. PENZA:  That's correct, Your Honor.

23          MS. NECHELES:  I think that the only -- we, with

24  respect to this, we don't have any problem with giving the

25  government two more days on responding to this.  We don't have

71

1  any problem with giving the government two days to respond to

2  any of our motions.

3         I think the only issue was with respect to the

4  enterprise letter which is not responding to any motions, that

5  we're so concerned about the timing, that we would ask that

6  that date not be pushed back but the others, obviously we get

7  more time so if the government needs two more days to respond,

8  we have no objection.

9         MS. PENZA:  Your Honor, the government believes it's

10 unreasonable, given how compressed the schedule is, to have

11 us, having less time between the deadlines that were set in

12 place very purposefully for us to respond to their severance

13 motions and then having our enterprise or other evidence that

14 our deadline for that be now shorter, two days shorter.

15        THE COURT:  Well, it's not two days shorter.  It's

16 just not two days longer.

17        MS. PENZA:  We have two fewer days.

18        THE COURT:  Two fewer days.  Well, your application

19 to set back the deadlines by two days for all of the deadlines

20 that we have set is granted.

21        MS. PENZA:  Thank you, Your Honor.

22        THE COURT:  All right.  I am not going to quibble

23 about this particular issue and that issue.  So we have dealt

24 with that.

25        The next issue is the case has been deemed to be

72

1  complex for Speedy Trial Act purposes.  Is there any objection

2  to having that designation continue until March 18th, the date

3  of final jury selection and trial?

4          MR. AGNIFILO:  We agree to continue it to March.

5          THE COURT:  Thank you.

6          MR. SOLOWAY:  Judge, can I raise one issue?  Since

7  you're on Speedy Trial now and you seem probably moving toward

8  the conclusion, there was just one issue I wanted to raise

9  about the schedule.

10          THE COURT:  Yes.

11          MR. SOLOWAY:  And that is simply that when I look at

12  the schedule, there's no reference to a date for expert notice

13  and I -- we didn't build that in here.  If the government is

14  planning on calling any experts, I think we should have put

15  that in the schedule and have a date for that.

16          THE COURT:  Why don't you work that out with the

17  government and send me a letter.

18          MS. PENZA:  Thank you, Your Honor.

19          THE COURT:  All right.  Now, so the defense would

20  like to have a meeting in February and in a couple of weeks?

21          MS. NECHELES:  Yes, Your Honor.  I don't know

22  exactly what date the government's brief would be due on the

23  severance but, or, you know, we can do our reply quickly.  Our

24  reply is due February 1st right now.

25          THE COURT:  Is that the pushback date?

73

1          MS. NECHELES:  I don't think we need to push that

2    date back.  If we keep that date, maybe thereafter keep all

3    the other dates, you know, so I think we could take two days

4    off of our time for the reply.

5          MR. SOLOWAY:  Your reply is January 30th.

6          MS. NECHELES:  So we can go back, go forward on

7    those dates, Your Honor, and then if we could meet --

8          THE COURT:  The following week, February 6th, a

9    Wednesday, at 11 a.m.?

10          MS. NECHELES:  Yes, Your Honor.  That's okay.

11    That's fine with us.  And, Your Honor, on that date, I know

12    one of the issues that we will be raising is the timetable.

13    Some of the, some of the defendants are concerned, very

14    concerned about time.  I know some -- there is a difference on

15    sort of timing and pushing forward and that will be one of the

16    issues that will be raised in the severance motion.

17          THE COURT:  What is pushing forward?

18          MS. NECHELES:  Keeping the current schedule for

19    trial, Your Honor.  In particular, we're concerned because of

20    some of the things that we've heard today and other things

21    about the superseding indictment and it being tied to dates

22    having to do with the privilege issue.  I want to set that out

23    in the brief that we will be submitting for Your Honor, some

24    of the details on that and the concerns that we have about

25    timing and new charges potentially and how that affects our

1  ability to be ready for trial, but we will put that in the

2  brief.

3          THE COURT:  That's fine.  Whatever you have to say,

4  please do, absolutely.

5          MS. NECHELES:  We will.

6          THE COURT:  Thank you.

7          Yes.

8          MS. PENZA:  Your Honor, the government does feel

9  strongly that if there's real concerns about timing by the

10 other defendants that those should be raised now because the

11 government should not be in a position of drafting our

12 enterprise and other acts motions and having this compressed

13 deadline if what the other defendants want is additional time

14 to review the voluminous discovery, to deal with the privilege

15 issues, which would be what one would expect normally.

16         THE COURT:  All right.  We are not going to discuss

17 that this afternoon, but what I'll do, if anyone has any

18 concerns about timing, that they provide the Court with a

19 letter on that subject for their client by this Friday.  That

20 way, everybody will know everything and then the Court can

21 deal with it and when we get together on February 6th, if you

22 haven't resolved all of these issues, whether it is a

23 superseding indictment or timing issues or evidence issues,

24 then we can take them up at 11 a.m. on February 6th.

25         MS. NECHELES:  Your Honor, we intend to put it in

1    the brief.  If you would rather we put it in a separate letter

2    or repeat it, we can do whatever you would like.

3             THE COURT:  Well, you are going to put something in

4    a brief but somebody else may want to put it in a letter so I

5    am giving you the opportunity, put it in a brief, put it in a

6    letter, but I need to know about this particular subject

7    matter by this Friday.

8             MS. NECHELES:  Thank you, Your Honor.

9             THE COURT:  And that way, everyone will know what

10   the range of problems might be.

11            MS. NECHELES:  Thank you.

12            THE COURT:  And because we have so many lawyers

13   involved in this enterprise, I really want to give you all the

14   opportunity to speak up and it is better to do it after you

15   have consulted with your clients and with your colleagues and

16   your firms and with other counsel for other defendants and you

17   provide the Court with your collective wisdom.

18            MS. NECHELES:  Thank you, Your Honor.  We appreciate

19   that.

20            MR. AGNIFILO:  One last thing, Judge.

21            THE COURT:  Sure.

22            MR. AGNIFILO:  I appreciate the government offering

23   to give the 3500 two weeks ahead of time and I think that's

24   helpful.  What I'm going to do is I'm going to speak to them

25   just me and them.  I'm going to ask for a little bit earlier

76

1    because I think, you know --

2            THE COURT:  Don't tell me about it.  I assumed you

3    were going to do that, it always happens, and you wouldn't be

4    doing your client a service if you didn't do it.  So I assume

5    that all of you will be calling and saying it isn't enough

6    time, we need more notice, and then if you are not happy with

7    what you hear from the government, you are going to ask me.  I

8    could write the book on it.  So why don't you just do it and

9    not worry about it with me right now.  We will resolve this.

10            MR. AGNIFILO:  Sounds good, Judge.

11            THE COURT:  All right.

12            MR. AGNIFILO:  Thank you.

13            THE COURT:  Ms. Necheles, more?

14            MS. NECHELES:  Yes, Your Honor.

15            THE COURT:  You were so quiet, I was sort of worried

16    about you.

17            MS. NECHELES:  Thank you.  I knew that.  Thank you,

18    Your Honor.

19            I don't want to raise it right now but if we could

20    at the end deal with Ms. Bronfman's bail issues that's pending

21    in terms of the no contact issue and also Ms. Salzman.

22            THE COURT:  Mr. Haddad, my clerk on the case, a

23    clerk on the case, I've got more than one on the case,

24    indicated that we were sort of busy getting ready for the oral

25    argument but that we have all the materials from both sides

77

1  and we will get to it with alacrity.

2          MS. NECHELES:  Thank you.

3          THE COURT:  Okay.  Anything else from the government

4  for today?

5          MS. PENZA:  Nothing from us, Your Honor.  Thank you.

6          THE COURT:  Anything else from the defense?

7          MR. AGNIFILO:  Thank you, Your Honor.

8          THE COURT:  Okay.  Thank you, everybody.  Have a

9  good afternoon.

10         MS. NECHELES:  Thank you.

11         (Matter concluded.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25