UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

KATHY RUSSELL

Defendant.

18 CR 204 (NGG)

**SENTENCING MEMORANDUM OF KATHY RUSSELL**

Justine Harris
Amanda Ravich
SHER TREMONTE LLP
90 Broad Street, 23rd Floor
New York, New York 10004
Tel: 212.202.2600
Fax: 212.202.4156
E-mail: jharris@shertremonte.com

*Attorneys for Kathy Russell*

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ...................................................................................................... iii

PRELIMINARY STATEMENT ................................................................................................ 1

FACTUAL BACKGROUND ..................................................................................................... 4

I.     Personal History .............................................................................................................. 4

       a.     Kathy's Upbringing ............................................................................................ 4

       b.     Kathy's Cycle of Abusive Relationships ............................................................ 5

II.    NXIVM ........................................................................................................................... 7

       a.     Kathy's Introduction to NXIVM ........................................................................ 7

       b.     Kathy Falls Under Raniere's Spell ..................................................................... 8

       c.     Kathy's Work at NXIVM – "Indentured Servant" ............................................. 10

       d.     Kathy is Subjected to NXIVM's Cycle of Control and Punishment ................... 13

       e.     Kathy's Attempts to Leave NXIVM ................................................................... 15

III.   The Indictment, the Plea Agreement and the Guidelines ................................................. 17

IV.   Kathy's Efforts to Rehabilitate and Start a New Life ...................................................... 21

       a.     Physical Separation from NXIVM ...................................................................... 22

       b.     Therapy and Self-Reflection .............................................................................. 22

       c.     Reconnecting with Family ................................................................................. 25

       d.     Work .................................................................................................................. 27

       e.     The Road Ahead ................................................................................................. 28

ARGUMENT ............................................................................................................................. 29

A SENTENCE OF PROBATION IS SUFFICIENT PUNISHMENT ....................................... 29

I.     The Circumstances of the Offense Are Mitigating Because Within NXIVM, Kathy
      Lacked Power And Was Repeatedly at the Receiving End of the Organization's Coercive
      Tactics ............................................................................................................................ 30

i

II.     Incarceration is Not Needed to Prevent Recidivism or Achieve Specific Deterrence Because Kathy Has Denounced NXIVM and is Rebuilding her Life ............................. 33

III.    Incarceration is Not Needed to Promote Respect for the Law or Achieve Just Punishment or General Deterrence ..................................................................................................... 36

IV.     The Needs of Kathy's Family Weigh in Favor of a Non-Custodial Sentence .................. 38

CONCLUSION .............................................................................................................................. 39

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Gall v. United States*,
552 U.S. 38 (2007)...................................................................................... 36, 37

*Mistretta v. United States*,
488 U.S. 361 (1989)............................................................................................. 33

*Pepper v. United States*,
562 U.S. 476 (2011).............................................................................. 29, 34, 36

*United States v. Al Halabi*,
563 F. App'x 55 (2d Cir. 2014) ........................................................................ 29

*United States v. Blake*,
89 F. Supp. 2d 328 (E.D.N.Y. 2000) .............................................................. 34

*United States v. Bryson*,
229 F.3d 425 (2d Cir. 2000)............................................................................... 34

*United States v. Cavera*,
550 F.3d 180 (2d Cir. 2008)............................................................................... 29

*United States v. Coello*,
415 F.Supp.3d 306 (E.D.N.Y. 2019) .............................................................. 38

*United States v. Cosme*,
No. 06-cr-608 (JBW), 2010 WL 276599 (E.D.N.Y. Jan. 19, 2010)............... 33

*United States v. Husein*,
478 F.3d 318 (6th Cir. 2007) ............................................................................ 39

*United States v. K*,
160 F. Supp. 2d 421 (E.D.N.Y. 2001) ............................................................ 34

*United States v. Maier*,
975 F.2d 944 (2d Cir. 1992)............................................................................... 36

*United States v. Nesbeth*,
188 F. Supp. 3d 179 ........................................................................................... 38

*United States v. Singh*,
877 F.3d 107 (2d Cir. 2017)............................................................................... 29

**Statutes**

18 U.S.C. § 1546(a) ........................................................................................... 18

18 U.S.C. § 3553(a) (2012) .................................................................... 29, 38, 39

28 U.S.C. § 994(j) ............................................................................................. 33

**Rules**

Fed. R. Crim. P. 32 (i)(3)(B) ............................................................................ 19

U.S.S.G. § 2L2.1 ........................................................................................ 18, 19

U.S.S.G. § 5C1.1 .............................................................................................. 34

# PRELIMINARY STATEMENT

Kathy Russell is before Your Honor because of serious mistakes that she made.  As she explains in her attached letter to the Court, she ignored her own moral compass and committed crimes.  *See* Exhibit D.  She falsified immigration documents to help an individual come to the United States for the purpose of working for NXIVM.  She also engaged in other illegal conduct: in 2004, she drove a non-citizen using false documents across the US-Canadian border, and in approximately 2005, played a role to help others impermissibly access someone else's computer. The extent of Kathy's remorse for her participation in these crimes, and indeed her entire 17-year affiliation with Raniere and NXIVM, cannot be overstated.  She is profoundly sorry.  She hopes that she can make amends to her family – in particular, to her son who she abandoned at age 12 – and to the many people who were hurt by the organization that she helped support.  While denouncing Raniere and NXIVM without hesitation, Kathy blames no one else for her mistakes and takes full responsibility for her criminal conduct.

The United States Sentencing Guidelines recommend a sentence of 6 to 12 months.  Two powerful reasons warrant a modest variance and imposition of a term of probation.  In the alternative, because Kathy's offense level is 10, and her guidelines are within Zone B, this Court may, without even granting a variance, substitute a term of home confinement for the minimum term of imprisonment.

First, the circumstances of Kathy's criminal conduct are extraordinarily mitigating.  This Court should consider that, like so many who fell prey to Raniere's influence, Kathy's loyalty to NXIVM was secured and maintained through a systemic pattern of manipulation, coercion, and punishment.  She was worked to the bone, barely paid living wages, starved and psychologically abused.  Simply put, for most of her time with NXIVM, Kathy was at the receiving end of a

brutal diminishment of her personhood and deliberately kept ignorant as to many of NXIVM's darkest secrets, including, most significantly, DOS. While this in no way excuses her own conduct, it is nonetheless highly relevant in determining the appropriate sentence. And while many of the women in this case – both co-defendants and victims alike – share this history of abuse, Kathy was particularly psychologically vulnerable to Raniere's manipulative tactics. As the attached psychological evaluation explains, because of her upbringing and past abusive relationships, Kathy was unusually susceptible to his tactics. Also, unlike some of her co-defendants, she had neither money nor fame, and simply lacked the economic means to escape.

Second, and perhaps most importantly, a term of probation is warranted because, since her arrest, Kathy has made a psychological transformation. She has come to understand that what kept her captive was a lie and now knows that the man she spent years blindly worshipping is, in fact, "likely a psychopath." Exhibit C at 9. In the years she has spent on pretrial release, Kathy has worked hard to escape NXIVM's influence, to examine the psychological vulnerabilities that made her susceptible to Raniere's coercive tactics, and to rebuild a healthy and sound future for herself and her son. After her guilty plea, Kathy moved to Georgia, away from everything and everyone she had known in Albany. She replaced her NXIVM family with her actual family, rebuilding her relationship with her adult son, Silas, and her sister, Kelly. Despite poor odds, she found a job and created a consulting company with her son so that they could support themselves financially with the hope of buying a house together in North Carolina where Silas can finish his education.

More than that, her rehabilitative efforts have focused inwards. In the three years since her arrest, Kathy has dedicated endless hours to self-reflection, both on her own and in therapy,

to "identify and resolve any personal issues that might have contributed to the choices that led to her current legal circumstances." Exhibit A (Amy Heesacker Letter dated February 10, 2020).

Many can vouch for Kathy's rehabilitation. Kathy's close and intimate circle of friends, her son, and her sister, attest to her newfound understanding of how Raniere's destructive and deceptive tactics trapped her and so many others. In their letters, attached as Exhibit A, they attest that her progress, while self-directed and determined, has been hard earned. Kathy's treating therapist also provides a powerful testament to Kathy's transformative journey, emphasizing that "[i]t has been an honor to work with Kathy as she works diligently to better herself and to make strides towards being a productive and positive person in her community." Exhibit A (Amy Heesacker Letter dated February 10, 2020). And Dr. Jessica Pearson, a licensed psychologist who has been previously appointed in cases in this district, conducted a forensic psychological evaluation, interviewing Kathy for over five hours on four different occasions and reviewing collateral material. Significantly, in her report attached as Exhibit C, Dr. Pearson concluded that Kathy "has developed significant insight into how and why she became vulnerable to Mr. Raniere and the intense psychological pressure placed on her by others in the group" and "has developed an understanding of how his teachings were used to manipulate her and others, and how they have led to lasting devastating effects on some of the people involved." Exhibit C at 9.

Given Kathy's genuine progress and positive trajectory, any time in prison would be devastating. Not only would it cause lasting and irreversible psychological harm on a 62-year-old woman who has worked so hard to understand and overcome the root causes of her trauma and poor decision-making, but it would also disrupt the life of her son, whose future is now inextricably intertwined with hers. He says that the incarceration of his mother would be

psychologically "devastating" and "would make it impossible for [him] to continue [his] education in the way that [he] hope[s]." Exhibit A (Silas Bryant Letter). For many years, NXIVM kept them apart; the group thrived in part by severing its participants' ties to those outside the organization. Kathy is now reconnected with her true family, and it is in her best interest and that of society to ensure that she continues on that path.

## FACTUAL BACKGROUND

### I. Personal History

#### a. Kathy's Upbringing

Kathy's childhood was difficult. Born on November 22, 1957, in Jacksonville Florida, Kathy Russell is the oldest daughter of Gerden Russell, Jr. and Joan Wise. PSR ¶ 169. Kathy and her two younger sisters, Kelly and Patricia, were raised in a modest middle-class household. While Kathy's parents worked hard to support the family financially—her father in the film and projection industry and her mother as nurse on an OBGYN floor of a hospital—the home was governed by strict rules and a marked lack of affection. *See id.* ¶¶ 169-170. Both parents suffered from psychological disorders, and they mistreated each other and their children. *See* Exhibit C at 2; *see also* PSR ¶¶ 169-170. Kathy's mother struggled with depression and anxiety, attempted to take her own life when Kathy was just 10 years old, and received electric shock therapy treatment. *See* Exhibit C at 2. Kathy's father suffered from borderline personality disorder and was prone to frequent mood swings and intense anger. *Id.*; *see also* PSR ¶ 169. He had difficulty expressing love or affection of any kind and struck his children with a belt for the slightest rule violation. Even more painful, however, was the continuous verbal and emotional abuse that both parents doled out – berating their daughters' intelligence or capabilities at every opportunity. *See* PSR Second Addendum ¶ 170 (Kathy's "father often yelled at his children,

especially when any of them asked for homework help").  As a result, from an early age, Kathy grew up fearful in her own home, craving emotional care and outward expressions of love.  *See* Exhibit C at 2 ("Ms. Russell reported a difficult childhood with parents who were 'addicted to substances' (prescription medications) and were emotionally unavailable.").

After her parents divorced when she was 14, Kathy moved in with her father, who she considered the lesser of two evils at the time.  *See* PSR Second Addendum ¶ 170.  But when she was 16, she and her father were in a near-deadly car accident after a drunk driver side-swiped their car on a bridge.  *See* PSR ¶ 170.  While Kathy suffered a minor head injury and was in the hospital for a few days, the accident left her father unconscious for nearly two weeks. *See id.*  He had traumatic brain injury and had to re-learn how to speak and walk.  Kathy was his nurse and caretaker, but the accident turned her father even more belligerent and emotionally violent.  *See* Exhibit C at 2-3; *see also* PSR ¶ 170; PSR Second Addendum at 1.

As soon as she was able, Kathy started a new life on her own.  After graduating from high school in 1975, Kathy moved out of her father's house and rented a room from a friend in Jacksonville, Florida.  The next year Kathy enrolled in Florida State College but left after just two semesters.  PSR ¶ 187.  Without any significant financial support from her family, Kathy had to work and landed a job at the front desk at an animal hospital.  She soon discovered that the hospital's accountant was stealing money.  When she told her boss, he gave her the position.  This was Kathy's first experience managing a company's books; she learned the basics of accounting on the job.  Kathy continued to work in accounting for the rest of her career.

**b.  <u>Kathy's Cycle of Abusive Relationships</u>**

Sadly, Kathy had trouble maintaining supportive and healthy adult relationships.  In Florida, Kathy began her first significant relationship with a man named Robert O'Sullivan

("Bob") in 1980.  Bob was an alcoholic and, over time, became physically and emotionally abusive towards Kathy.  *See* Exhibit C at 3; *see also* PSR ¶ 174.  She wanted to leave him but feared being alone and unable to support herself.  And in 1981, Kathy moved to Anchorage, Alaska with Bob to live near his brother.  PSR ¶ 174.  Kathy was eager to leave Florida and hoped that moving near family would cause Bob to become "less violent and more responsible." Exhibit C at 3; *see also* PSR ¶ 174.  The opposite occurred.  On their cross-country drive to Anchorage, Bob threatened Kathy with a knife and knocked her to the ground during a violent outburst.  *See* PSR ¶ 174.  The physical abuse and erratic outbursts continued after they arrived in Alaska, and within two years of moving, Kathy finally ended their relationship.  Exhibit C at 3.

By the mid-1980s, Kathy started working as an accountant at M-W Drilling, Inc., where she met Randolph Bryant ("Randy").  When she became pregnant, they planned to marry despite challenges in the relationship.  Although Kathy miscarried, she went forward with the engagement.  One week before the wedding, Randy for the first time became physically abusive, knocking Kathy to the ground.  *See* Exhibit C at 3.  While Kathy briefly considered leaving Randy, she feared being alone and unable to support herself, and naively believed that the abuse had been an aberration.  *See id.* (Kathy "stated that she had told herself that she would never be with someone who was abusive, but she described that the fear of not being able to support and care for herself outweighed that intention").  Sadly, Randy continued to emotionally, verbally, and physically abuse Kathy throughout their marriage.  *Id.*  Kathy tried her best to salvage, or at least manage, her marriage, including by seeking therapy for several years.  PSR ¶ 180.

In 1990, Kathy gave birth to their son, Silas.  Exhibit C at 3.  When Silas was four, Kathy finally sought a divorce from Randy; she could not tolerate his abuse any longer, and the two

disagreed sharply over parenting styles.  *See* PSR ¶ 175.  While the court gave Kathy and Randy joint custody, Silas primarily lived with Kathy until he was 12 years old.  Exhibit C at 3-4.

## II.  NXIVM

### a.  Kathy's Introduction to NXIVM

Kathy learned about NXIVM from her hairdresser.  It was 2001, and at the time, Kathy was struggling both personally and professionally.  She was working long hours at a job that she was on the brink of losing, while also juggling the demands of single parenting.  She worried that if she did not seek help soon, she would end up like her mother – depressed and alone.

Telling her that NXIVM could help her become happier and more fulfilled, Kathy's hairdresser enrolled her in a 16-day "intensive" in Anchorage, Alaska.  Kathy quickly fell under the group's spell.  She believed that the course's teachings empowered her to look at life through a different and more thoughtful lens; it infused daily acts with greater meaning.  Kathy signed up for another intensive, and later that summer, in August 2001, flew to Albany for her second course.  There she met NXIVM's founding members, including Raniere, Nancy Salzman, and Lauren Salzman.  In December of that year, Kathy attended a multi-day course on rights and privileges taught by Rainere in Albany.  Kathy walked away from the course not only with a new belief system, but also with the drive and passion to dedicate more time to what she thought was a transformational organization.  Kathy was also decidedly fixated on Raniere, who she believed was brilliant and who paid her particular attention.

In early 2002, Kathy participated in additional trainings in Albany, many led by Nancy Salzman.  During this time, Kathy also began developing an intimate relationship with Raniere.  At the time, she believed that he had the unique ability to put her emotions on an "overhead projector" and truly see everything inside of her.  Given her past abusive relationships, this made

7

her feel special.  By March 2002, Raniere had initiated a sexual relationship with Kathy.  A few months later, Nancy Salzman asked Kathy to move to Albany and work full time as a bookkeeper for NXIVM.

There were plenty of reasons to turn down the job.  For one, Silas refused to move to Albany, opting to stay with his father in Alaska.  Thus, moving to Albany would mean leaving her son in Randy's custody.  Not only that, but her compensation would fall off a cliff.  At her job in Alaska, Kathy made $40/hour, earned a 401(k), and enjoyed other benefits including 6-weeks' vacation.  NXIVM offered her just $15/hour to be an independent contractor, with no benefits whatsoever.  Nevertheless, Kathy pushed the obvious negatives out of her mind; she was singularly focused on getting closer to Raniere and was desperate to belong to a community that she perceived to be welcoming and thoughtful and, on its face, was dedicated to self-improvement and improving the world.  In July 2002, Kathy accepted the job.

### b.  Kathy Falls Under Raniere's Spell

When Kathy first moved to Albany, she was completely enthralled with Raniere.  At the start of their sexual relationship, Raniere asked Kathy for a five-year commitment "just to him." Exhibit C at 4.  While she initially had reservations, Raniere explained the commitment in such a "clear, logical way" that Kathy ultimately agreed.  *Id.*  Kathy believed that Raniere was uniquely able to fill the emotional void she felt inside and boosted her self-esteem.  While Kathy now understands that Raniere was a master of manipulation, and made her feel loved only so he could ultimately control her, at the time the care and attention was intoxicating.

As with many others in the organization, when Kathy moved to Albany, Raniere demanded from her damaging "collateral" to prove her commitment and severe weight loss.  As far as collateral, Raniere taped Kathy making incriminating statements about an incident in

Alaska – and held it over her head for years to come. As to her weight, Kathy weighed just a little over 100 pounds when she arrived in Albany. Raniere told Kathy she should get down to her high school weight of 85 pounds. Kathy struggled to lose over 10 pounds to meet Raniere's demands.

Around 2004, about two years into their relationship, Raniere asked Kathy to make a *lifelong* commitment to him – a promise that she would never be with another intimate partner. Exhibit C at 4. Kathy agreed. But Raniere controlled every aspect of their relationship, and generally left Kathy wanting more. Raniere determined "when they saw each other, when they had sexual relations and how, and who was allowed to know or participate." *Id.* Nevertheless, Kathy cherished what she thought was Raniere's ability to give her deeper and unique insights into herself. Little did she know, Raniere would soon twist her desperate need to be loved into a tool of coercion.

In 2005, just a year after demanding a lifelong vow, Raniere began to phase out his sexual relationship with Kathy. He stopped it altogether in 2008, but still demanded that Kathy honor her commitment to him. As a result, Kathy found herself "begging [] to speak" and "spend time" with Raniere, but he generally refused to engage with her directly. Exhibit C at 4. For more than a decade, Raniere kept Kathy at arm's length, and communicated with her only when he needed something, refusing to respond to her texts and emails. By 2009, Kathy emailed Raniere in despair, explaining that their "moments of connecting" were "so infrequent" that they felt "almost non-existent." Exhibit B-1. Kathy went on to explain: "[I]t feels like I cry into the night and no one comes," and asked, "Is there something I can do different?" *Id.* Sadly, Raniere held out the possibility of renewing their relationship as a way to manipulate Kathy. He suggested that if she just worked harder, if she just did better, if she just "healed" her "ethical

breaches," maybe he would come back to her. Of course, that was a lie: no matter how hard she tried, he never resumed a relationship with her and in fact, after 2008, he rarely interacted with her directly.

### c. Kathy's Work at NXIVM – "Indentured Servant"

Kathy felt trapped. She was distraught by Raniere's rejection. On top of that, her work was incredibly difficult. In her off- and on-again role as NXIVM's bookkeeper, Kathy engaged in a variety of tasks almost always at the direction of others – Raniere, Clare Bronfman or Nancy Salzman. As multiple witnesses made clear, nothing could get done without Raniere's approval or sign off, and that rarely came. Those outside the organization could see that Kathy lacked the resources and authority to get work done. As Paul Fruci, the outside accountant who worked with NXIVM over the years, writes in his attached letter, "Kathy was way underpaid for the skill and responsibility level and . . . was denied resources that she needed and as a result couldn't get things done that she was trying to accomplish on behalf of others." *See* Exhibit A (Paul Fruci Letter). Indeed, any sort of order Kathy tried to impose in the accounting department was repeatedly rejected as not the "NXIVM" way.

The most compelling witness to Kathy's workplace challenges is her own son, Silas. In 2011, Silas moved to Albany and worked with his mother for NXIVM. He was 21, not doing well in school, and needed to leave Alaska. Working alongside his mother in NXIVM, he was clear-eyed about how NXIVM was exploiting her. As he told Dr. Pearson, on the most basic level, Kathy was "severely underpaid and overworked," and as a result, "highly stressed." Exhibit C at 6. Kathy was "guilted or punished into working seven days a week, nine to twelve hours a day, while making subpar wages compared to others working in the same office." Exhibit A (Silas Bryant Letter). If Kathy "did not do something, those working at NXIVM

would berate her, threaten to fire her, or come up with a consequence that she was required to suffer." Exhibit C at 6. *See, e.g.*, Exhibit B-6 at 1 (Clare to Kathy: "[E]ither you must be incompetent or you are highly inefficient."); Exhibit B-2 (Lauren to Kathy: "Do you like and want to keep your job? If so, I think it's important to consider that you're not meeting the conditions of satisfaction of the people you're working for.").

What troubled Silas more, perhaps, was that Kathy was "fearful and anxious and unable to stand up for herself." Exhibit C at 6. Silas himself tried to speak up for this mother and, in at least one instance, confronted Clare Bronfman when he observed her treating Kathy "horrendously." *Id.* at 7. Silas asked Clare to treat his mother with "respect," *see* Exhibit B-6 at 1, but Clare simply dismissed his concerns, told him that "this is how things work in the program," and eventually punished Kathy for the whole episode. Exhibit C at 7. In fact, Clare berated and demeaned Kathy regularly. On one occasion, Kathy asked Clare if she could work from home during an especially busy period in 2015, to which Clare responded: "You are asking me to make your life easier yet, you refuse to consider anyone else – I feel like doing this supports your suffering and entitlement." Exhibit B-8 at 1.

In his view, Kathy had been conscripted to "indentured servitude." Exhibit C at 6. Because of this mistreatment, Silas urged his mother to leave. But Kathy lacked the financial resources, support system, and psychological wherewithal to do so. *See, e.g.*, *id.* at 7 (Kathy "had no other social contacts or supports"). As Silas explains:

> I wanted her to leave NXIVM. But neither she nor I had the economic means to make it happen. I told her to work another job on the side, without telling anyone, and save up money so she could have the means to leave for good. But somehow NXIVM had stripped her of all self-confidence. I could see the fear in her actions and behaviors, always worried about what Keith and Clare would say or do. And in reality, she worked so much there is no way she could have actually taken on another job. If she had stopped working so much for NXIVM, they would have noticed and punished her. They completely controlled her and her time.

Exhibit A (Silas Bryant Letter).

Indeed, Kathy's financial situation was precarious. Not only did she lack the financial resources to leave NXIVM, but she could not make ends meet on a day-to-day basis. *See* Exhibit C at 7. As reflected in emails Kathy sent to Nancy, Raniere, and Clare, she was often unable to make rent, pay for her car, pay her credit card, or even see a doctor. In 2010, Kathy emailed Raniere, explaining that she was "out of money," "living hand to mouth," and that she "didn't live this way before [she] came and [she didn't] want this to continue." Exhibit B-3. Five years later, nothing had changed. In 2015, Kathy wrote to Nancy Salzman in distress:

> I need to make a decent living, have health insurance, a decent car and to be able to put money away for when I get older. When I came here I had a fair amount of money…making $15/hr coming from $39/hr was difficult…and eventually all the money was gone. I am flat broke, my car is about to die… and I really don't have anything.

Exhibit B-9 at 1. But the response from Raniere and Nancy was uniform: Kathy needed to get through her own "limitations" and account for her many "ethical breaches" before she could make a fair wage.

Not only was Kathy working incredibly long hours for subpar wages and zero benefits, but she often was not even paid the little she had been promised. Clare Bronfman routinely docked Kathy's pay for hours that she had worked, for no discernable reason. *See* Exhibit C at 3; *see also* Exhibit B-4 at 1-2 (Clare to Kathy: "I am concerned your need for money right now is not helping you to look at this with the companies best interest and what is integrist [sic]"; Kathy to Raniere: "Clare wants to discount my billing by 15 hours. I find this unreasonable. This is not the first time she has deducted hours.").

### d.  **Kathy is Subjected to NXIVM's Cycle of Control and Punishment**

In truth, once Raniere decided that he no longer desired Kathy sexually, she was always in the doghouse, whether in the context of her bookkeeping work or otherwise.  She was told, for example, that she was too "fearful" or that she played the "victim," and that these shortcomings were "ethical breaches" she needed to heal and be punished for.  Kathy was required to write "breach plans," exploring the reasons for her behavior and creating a plan to address her supposed deficiencies, including by committing to certain "penances" or self-inflicted punishments.  *See* PSR ¶ 110.  Just one example of this occurred in 2016, when Kathy sent Nancy "a plan to address the destruction [she] created due to [her] inability to complete projects."  Exhibit B-12 at 1.  Kathy's plan included proposed penances if she failed to meet the project goals, including losing pay, running errands for her peers, planking daily, and reducing her calories by 200 each day for a week.  *Id.* at 1-2.  Nancy responded that Kathy didn't "understand [her] issues"; she claimed that Kathy had caused irreparable damage, told her she needed to "feel the pain of what [she'd] done," and directed that Kathy should be "happy to do whatever it takes."  *Id.* at 1.  Kathy was required to spend hundreds of hours on punishments, including, for example, writing letters to multiple insiders of NXIVM explaining a purported business failure.  Exhibit C at 5.

The punishment and controls extended to every aspect of Kathy's life.  NXIVM dictated how much she could weigh, what types of foods she could eat, who she could communicate with, and even how often she could dance.  At one point, Clare chastised Kathy for owning a cat, telling her that she did not make enough money to have a pet and that she would need Raniere's permission to keep her beloved animal.  *See* Exhibit C at 5.  As her current therapist explains, Kathy endured these "frequent harsh punishments . . . in part due to her belief that these might

make her a better person and because she thought at the time that they were deserved." Exhibit A-5 at 1. Kathy now understands that her feelings were merely a product of NXIVM's intentional distortion of reality, which thrived on her "low sense of self-worth and vulnerability." *See id.*

The NXIVM leadership used Kathy's supposed "limitations" not only to punish her psychologically, but also to strip her of her responsibilities. In fact, Kathy was fired or demoted on several occasions, including in 2006, 2014, and 2015. In 2010, Lauren Salzman threatened: "If you don't evolve certain limiting patterns, it will eventually result in you being replaced with someone more efficient who does not have obstruction issues." Exhibit B-2. After Clare fired Kathy in 2015, she emailed Kathy: "My greatest hope is you can evolve some of the problems in working with others so you can create a viable cash flow for yourself . . ." Exhibit B-10. Kathy was made to believe that she had personal "issues" that needed to be resolved before she could continue working for NXIVM. Sadly, she internalized the denigration, and came to believe that she was inadequate and unworthy. *See* Exhibit B-9 at 2 (Kathy to Nancy: "I realize that you have been quite kind in helping me see that my inability to work with others and narcissistic tendencies are what removed me from my job."); *see also* Exhibit B-7 at 1 (Kathy to Raniere: "I realize I have caused this and created much of this problem by my need to control, blame, complain and my indulgence in fear"); Exhibit B-5 (Kathy to Raniere: "[W]hile I'm working to evolve my anger and control…I seem to be unable to find what would be the thing to help me get past this and evolve this."). At its core, of course, these strategies were deliberately coercive, manipulating Kathy's mindset to believing that the problems were entirely her fault. *See* Exhibit B-11 (Kathy to Nancy: "It seems I'm really out to lunch…and I'm the one who is wrong here. Everyone else sees this but me. I really want to go…"). Silas, Kathy's son observed these

tactics of "hiring, firing, and low pay" as a means to "manipulate and trap [Kathy] to remain working for NXVIM."  Exhibit C at 7.

What little role Kathy had in NXIVM's programming was also stripped away from her as punishment.  Around 2014, after several years of threats, Kathy's status as a low-tier proctor in NXIVM's programming was placed on "inactive" status, because of her "fear" issues.  *See* Exhibit B-7 at 2 (Kathy to Raniere: "[W]hile I strive to correct my breach, my immature emotionality, my lack of communication, and correct my controlling behaviors...I'm not getting through it. I have a consequence of not getting through my issues and have been placed as inactive Proctor.").  After that, Kathy never again held the position of proctor or coach.

Desperate for approval, Kathy worked endlessly to get into the good graces of NXIVM's leadership.  But Kathy's hard work and acknowledgment of her purported issues were never enough.  *See, e.g.*, Exhibit B-9 at 1 (Kathy to Nancy: "In someways over the last year, I have worked harder than I have before to change things in myself.  In reality it wasn't enough to make the difference.").  Kathy now realizes that her efforts never stood a chance – her supposed "breaches," the punishments she endured, the rock bottom pay, the demotions, and the firings were all merely a means of controlling Kathy through calculated psychological manipulation.

### e.  Kathy's Attempts to Leave NXIVM

While very much under the organization's coercive yoke, in moments of lucidity, Kathy did try to leave NXIVM.  Nearly every year, starting in 2009, Kathy expressed a desire to leave. In 2009, Kathy wrote to Raniere:  "Each month for the last five months, I've written and rewritten emails about wanting to leave."  Exhibit B-13.  Over a year later, in 2010, Kathy wrote again to Raniere: "I really don't want to work under these conditions, and my initial impulse is to resign."  Exhibit B-4 at 1.  The next year, in 2011, Kathy told Raniere once again that she

thought it was best to "resign" and this time she asked for his "help." Exhibit B-5. Two years

went by, and no help was provided. In 2013, Kathy told Raniere that she was going to "look for

another job" where she could "have insurance and make more money," but admitted that she was

"having difficulty finding a way out." Exhibit B-7 at 2. A year went by, and nothing changed.

In 2014, Kathy reached out, this time, to Nancy Salzman and told her it was "time to ask Keith's

permission to . . . resign with the company," Exhibit B-14, explaining that her situation was

"unfair" and that she was "not willing to do this anymore," Exhibit B-15 at 1. Another year

passed, and Kathy found herself no closer to getting out. In 2015, Kathy emailed Nancy again:

"I don't want to go through another year of this." Exhibit B-16 at 2. By 2016, Kathy was still

expressing the same sentiment. She wrote to Nancy: "I really want to go." Exhibit B-11.

In short, Kathy *wanted* to leave, she just didn't know how – psychologically or

financially. Desperate and trapped, she even contemplated suicide. Exhibit C at 4; *see also* PSR

Second Addendum at 3. As Dr. Pearson explains, Kathy was "distraught that she didn't have a

relationship with [Raniere] anymore and felt trapped by living and working in the NXIVM

community." Exhibit C at 4. She contemplated killing herself because she believed she was not

otherwise "able to leave," *id.*, and felt "out of options," PSR Second Addendum at 3. But the

notion that all of her actions had to benefit Rainere was so ingrained, that she did not act on those

feelings because she could not think of a way to "kill herself that would not lead back to Keith

Rainere." Exhibit C at 4. In the end, at these darkest moments "even [Kathy's] suicidal ideation

and emotional distress was not more important than protecting Mr. Raniere." Exhibit C at 9.

Unlike many others involved in this case, who had wealth and/or powerful family

connections, Kathy's family was at a loss of what to do. They were deeply worried and afraid

for her. As Kathy's sister, Kelly, explains:

> [S]he was anorexic, lacked emotion, and spoke in a monotone voice. In talking to her, she appeared to have no control over her own life. I could tell she was being manipulated by others. I worried about Kathy. It seemed as if she was constantly being punished by others in NXIVM.

Exhibit A (Kelly Russell Letter). Despite their concern, however, Kathy's family didn't know how to help. Kelly explains:

> There were a couple of times that our younger sister, Trisha, and I discussed how to get Kathy out of the cult. We didn't have the knowledge nor the resources to intervene, and knew that it would be difficult to convince Kathy to leave because she had been brainwashed. Trisha and I felt hopeless, believing that one day Kathy would end up penniless and alone.

*Id*.

Given these circumstances, that Kathy did not leave Raniere and NXIVM on her own is not surprising. She lacked the psychological or financial resources to craft a viable exit strategy; nor did she have sophisticated family members to intervene and assist her. While her arrest has brought unbelievable pain and anxiety, she is now profoundly grateful that it finally allowed her to break free of Raniere's devastating grip on her life. The criminal case was, perhaps, the only thing strong enough to save her.

### III.    The Indictment, the Plea Agreement and the Guidelines

On April 20, 2018, the government indicted Raniere and Allison Mack. *See* ECF No. 14. Three months later, and 10 weeks after Kathy was subpoenaed to testify before the grand jury, on July 23, 2018, the government superseded, charging a racketeering conspiracy and adding four more defendants, including Kathy. *See* ECF No. 50. Kathy was arrested by the FBI on July 24, 2018.

On April 19, 2019,[1] Kathy pled guilty to one count of visa fraud in violation of 18 U.S.C. § 1546(a).  At the plea hearing, Kathy admitted to knowingly and intentionally presenting an employment letter to the United States Consulate in Mexico, in connection with a TN visa application for Loreta Garza Davila, that contained materially false statements regarding Ms. Garza Davila's job description and salary.  Specifically, Kathy admitted that, although she represented in the employment letter that Ms. Garza Davila was a management consultant for NXIVM, she was aware that Ms. Garza Davila spent most of her time working for a separate entity, Rainbow Culture Gardens.  Further, Kathy admitted that she knew that Ms. Garza Davila was not keeping the full amount of the salary listed in the employment letter.  Kathy accepted full responsibility for her actions, stating: "I know what I did was wrong, and I'm very sorry for the trouble I have caused.  I compromised my own principles and I will have to live with that for the rest of my life."  Tr. of Plea 26:21-24, *United States v. Russell et al.*, No. 18-CR-204-NGG (E.D.N.Y. April 19, 2019), ECF No. 756.[2]

Pursuant to the plea agreement, the parties stipulated that, under the 2018 United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G."), the Guidelines provision applicable to the offense of conviction is § 2L2.1.  The parties further stipulated that the following Guidelines provisions apply:

- Pursuant to U.S.S.G. § 2L2.1, the base offense level is 11.

- Pursuant to § 2L2.1(b)(1), because the offense was committed other than for profit, three levels are reduced.

---

[1] No significance should be attached to the fact that Kathy was the last defendant to plead guilty, *compare* ECF Nos. 473, 944, and 1084 *with* ECF No. 756, as counsel reached out to the government in the hopes of reaching a resolution well before *any* of the defendants pled guilty.

[2] As to the immigration fraud, Ms. Garza Davila is not a "victim" of the offense; indeed, Kathy filed the paperwork at her request.  While Ms. Garza Davila was subsequently recruited into the "first line" of DOS, Kathy of course had no knowledge of DOS, nor of Ms. Garza Davila's membership in it.

- Pursuant to § 2L2.1(b)(3), because Kathy knew, believed, or had reason to believe that the visa was to be used to facilitate the commission of a felony offense, four levels are added. Specifically, Kathy had reason to believe that Ms. Garza Davila did not keep the full amount of the salary listed in the employment letter and that instead, Ms. Garza Davila used some of the money to pay employees working at Rainbow Cultural Gardens, whose income was not reported for state employment taxes.

- Pursuant to § 3E1.1(a), because Kathy accepted responsibility, two levels are reduced.

Accordingly, the total offense level is 10. Kathy has no criminal history, so her Criminal History Category is I, resulting in a Guidelines range of 6 to 12 months' imprisonment, within Zone B. The Probation Department adopted the Guidelines calculation stipulated by the parties in the plea agreement. PSR ¶¶ 150-161.[3]

There is no material dispute between the parties about Kathy's crimes. As set out in the government's letter dated September 29, 2021, Kathy did engage in other criminal conduct for which she also accepts responsibility. Her role in that other conduct, however, was relatively limited. ██████████████████████████████████████████████ ████████████████████████ As both ████████████ trial testimony ████████ ██████████████████ make clear, Kathy was not part of the planning at all. Ms. Keeffe, together with Nancy, Raniere, Lauren and others, discussed the scheme and arranged for the identification

---

[3] Attached as Exhibit E are a copy of Kathy's April 10, 2020 Objections to the PSR. We note that while we have certain objections to the findings in the PSR, we do not believe that this Court needs to resolve these objections "because the matter will not affect sentencing." Fed. R. Crim. P. 32 (i)(3)(B) (Court may "determine that a ruling [on objections] is unnecessary either because the matter will not affect sentencing, or because the court will not consider the matter in sentencing").

to be produced.  Kathy came into the picture only because Ms. Keeffe asked her to drive, and, when they got to the border, directed Kathy, much to her surprise, to proceed on her own with the identification and retrieve ███████████.[4]

The circumstances surrounding Kathy's involvement in the scheme to access the computer of James Loperfido in approximately 2005 are similar.  ████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████  Specifically, Kathy distracted Mr. Loperfido so that ████████████ could access the computer and install a keylogger device.  ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████ ██████████

___

[4] ████████████ had been in a sexual relationship with Raniere beginning in late 2003.  Both the government and the Probation Department suggest that after ████████████ was back in the United States, Kathy later "reminded" ████████████ of "her assistance in transporting her across the United States border when Russell asked Dani to engage in sexual activity with Raniere and Russell."  *See* PSR ¶ 20; Government Sentencing Memo for Kathy Russell at 2 (ECF No. 1123).  But at trial, ████████████ testified that "Keith" asked her to join him and Kathy in a sexual encounter, Tr. 2418:9-23, and that Kathy never made an "explicit connection" between the border crossing and a three-way sexual encounter, Tr. 2419:11-20.  In fact, Kathy has no memory of reminding ████████████ that she brought her across the border in connection with any sexual activity with Raniere.  Rather, as ████████████ explained at trial, she just felt like she "should be grateful" and felt like "she owed them."  *Id*.

[5] ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████



---

20

Kathy deeply regrets acquiescing to these requests and being involved in this additional misconduct.[6]

## IV.    **Kathy's Efforts to Rehabilitate and Start a New Life**

In the months after her arrest, Kathy was shell-shocked.  While she had been with the organization for 17 years, there was still so much she had not known.  As the government concedes, she had no knowledge of DOS, an organization that was completely hidden from her until its name was splashed across the news.  Initially, she continued to believe in NXIVM, holding tight to its teachings and remaining loyal to Rainere.  As the case proceeded, however, the cards began to fall.  With separation from the community, and free from the constant manipulation, control, and coercion that had been exerted on her for more than 15 years, Kathy began to see and understand the truth.  Through her review of the discovery, and in conversations with those close to her, as well as with counsel, she "became aware of numerous deceptions she had experienced by Raniere and others working with him at NXIVM."  Exhibit C at 9.  "She described having her entire worldview shift and discovering that the man she gave a lifelong commitment to, who she believed was beyond human, was 'likely a psychopath' who had manipulated and used her and others."  *Id.  See also* Exhibit A (Paul Fruci Letter (Kathy's "legitimate life purpose for many years has turned into a cruel lie that destroyed both her personal and professional life.")).

This realization was devastating.  Kathy understood that everything she had worked towards, everything she had sacrificed, everything she believed in, was all part of an ugly and destructive lie.  Not only did Kathy begin to understand more clearly the conduct of those around

---

[6] Kathy also was involved in the financial arrangements related to ███████████'s visa.  Specifically, Kathy, at the direction of the accountant for Sagitta LLC, did pay invoices that Sagitta LLC submitted to Moving Pixels.  While Kathy was aware that the terms of █████'s visa required that he be paid by Sagitta LLC, she had no role in preparing that visa application or submitting it.  She also did not create any invoices for ████.

her, but importantly, she also turned her scrutiny inwards.  In the months and years after her arrest, she embarked upon a path of deep introspection and self-discovery, in which she began grappling in earnest with the profound errors she had made, the consequences of her blind devotion to Raniere and NXIVM, and the fact that the organization had done irreparable damage to so many people.

### a.  Physical Separation from NXIVM

When Kathy came to understand the true, nefarious nature of NXIVM and its community, she knew she needed to get far, far away.  While Kathy had few people outside of NXIVM to whom she could turn, her sister Kelly Russell did reach out.  After 16 years of very little contact, Kathy and Kelly "started talking regularly on the phone, texting, and visiting." Exhibit A (Kelly Russell Letter).  Understanding that Kathy had no money or means to support herself, Kelly offered Kathy her home in Georgia.  Seizing on this much-needed ticket out of Albany, Kathy moved to Georgia in June 2019, and began to rebuild her life.  *See* Exhibit A (Karen Abney Letter (Kathy "left her closest friends to put a physical distance between her and the negative influences in her life, to start life completely over in Georgia with her sister.")); Exhibit A (David Ashen Letter (Kathy's "relocation to Georgia with her son has allowed her to build stronger bonds to her family, begin a fresh start, heal herself, and move away from the negative influence that was NXIVM.")).  The physical separation from the NXIVM community over the past two years, has provided Kathy with the space and time to reflect on her mistakes and move forward in a more positive direction.

### b.  Therapy and Self-Reflection

In Georgia, Kathy has had the physical and mental space to engage in "an ongoing period of exploration, realization and recovery."  Exhibit C at 9.  Importantly, beginning in July 2019,

Kathy has been working with a therapist to better understand the issues that led her to her current circumstances and "to continue her life goals of self-understanding and self-improvement." Exhibit A (Amy Heesacker Letter dated February 10, 2020). According to Kathy's therapist, Kathy has been "consistently and actively focused on her goals in and outside of sessions," *id.*, and is "work[ing] diligently . . . to rebuild her sense of self-worth and confidence while also contributing as a productive member of society." Exhibit A (Amy Heesacker Letter dated May 8, 2021). The hard work that Kathy is doing in therapy is real. According to Ms. Heesacker, Kathy "does not shy away from exploring the more difficult moments of her life and addressing how she might continue to improve her psychological functioning." *Id.* This effort has paid off. Her therapist explains:

> Through therapy and her own work outside of therapy, Kathy has grown in her understanding of how her trauma history in both her family of origin and past intimate relationships may have contributed to her low sense of self-worth and vulnerability at the time she chose to become involved with the organization . . . In the process of coming to terms with how her poor self-esteem may have contributed to her decision in the past, Kathy has begun to rebuild her sense of self-worth in the world and is clear about her life's purpose of working to improve people's lives in society.

Exhibit A (Amy Heesacker Letter dated February 10, 2020).

Dr. Pearson, who conducted a psychological evaluation of Kathy, has shared similar sentiments:

> She has developed an understanding of how [Raniere's] teachings were used to manipulate her and others, and how they have led to lasting devasting effects on some of the people involved. She developed an understanding that Mr. Raniere was after satisfying his own sexual desires and need for power and control and used her and others, including underage girls, to do so. Ms. Russell has acknowledged that the process of developing insight and understanding has been painful but has led her to a more positive and peaceful place in her life. She reported being grateful for the opportunity to better understand herself and re-establish a close connection with family, especially her son.

Exhibit C at 9-10.

Kathy's family and friends have seen first-hand how Kathy has dedicated herself to understanding her past mistakes and ensuring that she is well-equipped to live a positive, honest life going forward. Silas explains:

> [S]he now realizes how blinded she was by Keith and the way he utilized the program for his own personal gain under the guise of ethical personal development. Her introspection from what happened is an everyday occurrence, as she tries to understand the weaknesses that allowed her to be manipulated. She often reflects on how she made rationalizations for Keith, believing the lie he wove into the program that his actions were the pinnacle of good or ethical. I see her say how stupid she was for not being able to question the negative aspects of NXIVM. She wishes she had seen how nefarious Keith was and that she had never allowed herself to be so easily controlled.

Exhibit A (Silas Bryant Letter). Similarly, Kathy's sister, Kelly, is proud that "Kathy has denounced Keith Raniere and has worked hard on her self-improvement." Exhibit A (Kelly Russell Letter). Kelly explains:

> Kathy is working on herself and figuring out why and how she got involved in this criminal activity. She has told me how much she regrets her mistakes and her involvement with NXIVM. She has been able to find a therapist with whom she connects and through therapy is working on understanding her own behavioral patterns and how she let herself be manipulated by Keith Raniere. On her own time, she spends a great deal of time reading psychology and philosophy to help improve herself. Through this work, she finally sees Keith for what he really is. I firmly believe that knowing what she knows now, she will never be involved in any wrongdoing again.

*Id*.

Kathy's friends have also shared their feelings on the difficult hurdles Kathy has overcome in processing and learning from her experiences. As a friend notes, "Kathy has expressed how she wished she had questioned more of what was going on, so she could have seen what her efforts were supporting and wished that she hadn't trusted so naively." Exhibit A (Karen Abney Letter); *see also id.* (Angel Smith Letter ("Kathy has talked . . . about the deep remorse she has for the mistakes that she made. Kathy regrets

that she did not question Raniere more.  She regrets how little she knew about what was really going on.  Kathy deeply regrets the effect that NXIVM had on the people involved, that people lost their jobs, their livelihood, their sense of trust in the world, that families were split up and pitted against each other.")).

They are in fact uniform in expressing awe at her strength and her transformation.

Mr. Ashen writes:

> It has been a long and difficult process for her to unwind and "pull apart" the level of deception and damage that occurred.  I have watched Kathy struggle with reconciling her high value of doing good against some of the actions that occurred, actions that were not aligned with these values.  Over the past three years, I have been amazed by the work she has done, with the help of her therapist, and how she clearly comprehends what happened and how she participated.  It sometimes saddens me to talk with her and understand the years of manipulation and pain she endured, but I am always so surprised by the depth of her wisdom and how she has come to terms with what seems to be Keith's bad intents.  Her strength in both facing the reality of what happened and her ability to move on continues to amaze me.

Exhibit A (David Ashen Letter).

Put simply, Kathy has "deep regret at not realizing the reality of [Raniere's] behavior and intention," Exhibit C at 9, and is "highly motivated to develop a clear understanding of herself and her behaviors, in order to uphold the values she would like to define her life [by] now," Exhibit A (Dolores Wilson Letter).

### c.  Reconnecting with Family

Kathy has not only worked on rebuilding her sense of self since her arrest, but she has also focused on rebuilding her relationship with Kelly and Silas.  Reconnecting with her family has been the most meaningful and gratifying experience of Kathy's life.  While this prosecution has been incredibly painful, she recognizes that it gave her her family (and her life) back.  For this, Kathy is grateful.

Over the past three years, Kathy and Kelly have become sisters again. While Kelly lives and works in Savannah, Georgia, she visits Kathy regularly. Especially during the early visits, the sisters spent time catching up on decades of their lives and reflecting on where Kathy went wrong. Kathy and Kelly also spent time relaxing at home together, hiking in the nearby woods, or just walking around the neighborhood. Kelly has been a true blessing to Kathy, bringing her critical support and stability during the most difficult time in her life.

Kathy, too, has played a prominent role in Kelly's life. In July 2019, Kelly's husband tragically and unexpectedly passed away. Kathy quickly became the primary support system for Kelly. *See* Exhibit A (Kelly Russell Letter ("Kathy helped me in so many ways during the most difficult time of my life.")); *see also id.* (Angel Smith Letter ("I've observed Kathy as she relies on her family and allows them to now rely on her. I've watched Kathy be there for her sister in her sister's greatest time of pain, after losing her partner.")). Kathy introduced Kelly to her therapist, who Kelly now also sees regularly to work through the difficult issues that she is facing. As Kathy's friend put it: "[B]oth sisters continue to grow closer and closer, supporting each other despite their own losses." *Id.* (Karen Abney Letter).

Soon after she was arrested, Kathy also began rebuilding her relationship with Silas. Silas explains that his mother's arrest "began a process of reckoning and healing that has been painful but has built a foundation for a future together." *Id.* (Silas Bryant Letter). Taking pity on his mother, who "barely had anyone after she was arrested and was left with no money or means to care for herself," *id.*, Silas visited her the winter after her arrest and helped her move to Georgia in 2019. In 2020, Silas was struggling to find good employment, and Kathy encouraged him to move into her sister's home with her in Georgia. After so many years apart, Kathy desperately

wanted to make amends with Silas—to finally be there for him, to support him, and to help him "pursue new opportunities." *Id*. Silas decided to move to Georgia in August 2020.

Over the past year, Silas and Kathy have worked hard to develop a solid relationship. They spend "time together to understand and learn about each other." *Id*. They also spend time just relaxing together – cooking, going on daily walks, watching TV, playing badminton, and engaging in deep conversation. *See id*. Together, they are "trying to build [them]selves up and enjoy this new step in life." *Id*. Now, Silas explains:

> I finally have my mother back in my life in a meaningful way. She is helping me get back on my feet, financially and psychologically. We are each other's principal support systems.

*Id.*

### d. **Work**

Kathy left NXIVM without any money to her name. For months she struggled to get back on her feet, doing occasional consulting and bookkeeping work for friends just to get by. In July 2020, Kathy obtained freelance consulting work through a friend, and decided to continue this work under a company for herself and her son, Silas. The hope would be that Silas gain some skills to become "self-sufficient and financially grounded." PSR Second Addendum at 4.

Through the company they created, Kathy and Silas perform consulting work, principally in the areas of accounting and IT. While at the present, the bulk of their work comes from one company, Silas works alongside Kathy conducting the quality control software testing and handling some of the administrative tasks involved in running a business, including paying the bills, and running payroll. Silas explains that the business "has allowed [Kathy] to teach [him] new skills and give [him] new experiences that [he]

would not have otherwise."  Exhibit A (Silas Bryant Letter).  Kathy hopes to recruit other clients and to "continue to grow the business until her retirement and be able to leave a thriving business for her son."  Exhibit C at 3.

      **e.  <u>The Road Ahead</u>**

With the Court's permission, Kathy and Silas hope to move to North Carolina and build on their new life together.  Kathy is working hard to gather enough resources so that she and Silas can be independent and live in their own home in a new community.  *See* Exhibit A (Angel Smith Letter ("Kathy would like to move to North Carolina . . . so that she can have normal relationships with people, not be so isolated, and forge a new life for herself and her son.")).  Silas is a year and a half away from finishing his college degree, and, hoping to eventually get a masters in psychology, plans to continue his studies at one of the many educational institutions in the surrounding area.

As her family and friends can attest, Kathy wants nothing more than to be an honest, productive member of society.  *See* Exhibit A (Amy Heesacker Letter dated February 10, 2020 ("It has been an honor to work with Kathy as she works diligently to better herself and to make strides toward being a productive and positive person in her community.")); *id.* (Karen Abney Letter ("Kathy wants nothing more than to craft a quiet life working for normal, honest people.")); *id.* (Patrick Maloney Letter ("Today Kathy is living a quiet life and starting over an even better person.")); *id.* (David Ashen Letter ("I am so very proud of the level of responsibility she has taken and how she has moved on to a more positive direction in her life.")); *id.* (J. Marilyn Charlotte Letter ("I know [Kathy] is working hard to make things right.")).  She wants a quiet and meaningful life, far from the spotlight that these proceedings have thrust upon her.  As her son, Silas, puts it:

> All she wants to do now is move past everything that happened in NY, find a better meaning for her life, build a stronger relationship with me, deal with the issues that allowed her to be manipulated by Keith, develop a beneficial path for herself and those around her, gain some stability while we are here in GA and gather enough resources for us to purchase a house in North Carolina (NC).

*Id.* (Silas Bryant Letter). Kathy, and those around her, are optimistic that her future can be bright.

## ARGUMENT

## A SENTENCE OF PROBATION IS SUFFICIENT PUNISHMENT

As this Court knows, district courts have an "overarching duty 'to impose a sentence sufficient, but not greater than necessary,' to serve the purposes of sentencing." *Pepper v. United States*, 562 U.S. 476, 491 (2011) (quoting 18 U.S.C. § 3553(a) (2012)). Though a sentencing court must consider the "kinds of sentence and sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant as set forth in the [U.S.S.G.]," *id.* § 3553(a)(4), "calculating the correct Guideline range [is] 'just an initial step in the sentencing process,'" *United States v. Al Halabi*, 563 F. App'x 55, 57 (2d Cir. 2014) (citation omitted). A "district court may not presume that a [G]uidelines sentence is reasonable." *Id.* (quoting *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc)). Indeed, the United States Supreme Court has "emphasized that '[h]ighly relevant—if not essential—to [the] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics.'" *Pepper*, 562 U.S. at 488 (citations omitted) (alterations in original). Finally, the Second Circuit has recently stated that "a sentencing judge must have a generosity of spirit, that compassion which causes one to know what it is like to be in trouble and in pain." *United States v. Singh*, 877 F.3d 107, 121 (2d Cir. 2017) (internal quotation marks omitted).

Kathy's crimes were not insignificant.  Lying on a visa application is serious, and her 17-year affiliation with NXIVM supported Raniere and tacitly implicated her in the crimes being committed by others.  She is deeply ashamed of her own misconduct.  As Kathy explains:

> What is most horrific for me is the realization that my acts in blind faith indirectly supported him to continue his acts of abuse and criminal behavior to others.  To think that others were hurt far worse than me, and that I was somehow involved hurts me deeply . . . I am deeply ashamed and regretful for what my actions have caused and what it meant to be someone who supported and was complicit with Keith.  Sending a message to everyone in the community who believed Keith was someone to trust, that he was honorable, and someone who lived a moral life.  I apologize to each and every person for supporting such a deceitful and devious person.

Exhibit D (Kathy Russell Letter).  But given the mitigating facts about her personal history, her modest circumstances, and her lesser role within NXIVM, the sentence the Court imposes should take into account Kathy's deep remorse and the enormous personal progress she has made since her arrest.  As Dr. Pearson's report makes clear, Kathy was subjected to enormous psychological and economic control; indeed, her personal history and background made her particularly vulnerable to Raniere's manipulative tactics.  It is all the more remarkable therefore, that since her arrest, Kathy has taken extraordinary steps to rebuild her life.  Her separation from NXIVM, her dedication to counseling and self-reflection, her recommitment to her family, and her efforts to become financially self-sufficient, all demonstrate that she is committed to rehabilitation.  A sentence of probation would allow her to continue rebuilding a healthy and economically stable life.

I.      **The Circumstances of the Offense Are Mitigating Because Within NXIVM, Kathy Lacked Power And Was Repeatedly at the Receiving End of the Organization's Coercive Tactics**

Kathy accepts full responsibility for her crimes.  She engaged in wrongdoing and understands that she will be punished for her mistakes.  But it is nonetheless relevant that when

she committed these crimes, she was subjected to extreme psychological coercion and manipulation. As this Court has recognized, Raniere knew "how to keep people from leaving, that's his skill." Raniere Sentencing Hr'g Tr. 127, *United States v. Russell et al.*, No. 18-CR-204-NGG (E.D.N.Y. Oct. 27, 2020), ECF No. 1002. And, as set out above, Raniere certainly kept Kathy from leaving – mentally and physically. As early as 2009, Kathy expressed her deep desire to leave nearly every year, admitting to Raniere in 2013 that she was "having difficulty finding a way out." *See* Exhibit B-7 at 2. Nonetheless, she never managed to act upon this expressed desire. Silas attributes Kathy's inability to leave NXIVM to the complete control the organization had over her, which he explains "stripped her of all self-confidence" and left her entirely financially dependent. *See* Exhibit A (Silas Bryant Letter).

Of course, Raniere controlled and manipulated all of the women in his orbit in different ways and to different degrees. But in evaluating the significance of that manipulation for purposes of this sentencing, the Court should consider that Kathy had particular vulnerabilities. Neither famous nor rich, she had limited economic resources and, as Dr. Pearson's report makes clear, a background and personal history that made her particularly susceptible to Raniere's form of psychological control. Ex. C at 7. Years of verbal, emotional, and physical abuse – first from her parents and later from romantic partners – conditioned Kathy to have a self-critical and self-blaming attitude. *Id.* at 8. As Dr. Pearson explains:

> Ms. Russell's history of physical abuse and emotional neglect from her parents, as well as her history of intimate partner violence led her to be more vulnerable to predatory and manipulative individuals, especially those who use love and attention as a grooming tool.

*Id.* at 9. It is a perspective shared by Kathy's son, who described her family as "dysfunctional" in a way that "likely contributed to her engagement with Keith Raniere." *Id.* at 7.

Kathy's fear of not being able to survive financially also made her vulnerable to NXIVM's tactics. To Dr. Pearson, Ms. Russell described "a lifelong fear of being alone and unable to support herself monetarily as one of the driving forces behind staying in abusive relationships and staying at NXIVM." *Id.* at 9. Thus, by providing Kathy with what she so desperately needed – "positive attention, close friendship and comradery, as well as sexual intimacy, love, and employment" – Raniere and NXIVM were able to control all aspects of her life: "[NXIVM] controlled her social, financial, and employment functioning and Mr. Raniere controlled her sexual and intimate life." *Id.*

Indeed, the control Raniere exerted over Kathy was extreme. Believing she should always serve Raniere's interests, Kathy sacrificed her own well-being at every turn. When Kathy was desperate for a way out and contemplated suicide, she did not act on those impulses for fear that Raniere would be held accountable. As Dr. Pearson noted, "even her suicidal ideation and emotional distress was not more important than protecting Mr. Raniere." *Id.* Her physical health also was secondary to Raniere's whims. In 2013, Kathy broke her wrist, but could not seek treatment because she had neither insurance nor funds for medical care. *See id.* at 5. She begged Raniere for help, but he refused to authorize any financial assistance. *See id.* Instead, he demanded that Kathy – with her freshly broken wrist – drive him and another NXIVM member to get a haircut. Kathy, convinced at the time that Raniere's desires always "superseded even her most basic needs," obliged. *See id.* at 9. Dr. Pearson explains what is self-evident to even a casual observer of this case, but nonetheless bears emphasis: "Ms. Russell's willingness to follow the lead and rule of Mr. Raniere, the charismatic leader, and others in NXIVM, in addition to her willingness to engage in extreme self-sacrifice for the benefit of Mr. Raniere, is commonly seen in extreme groups such as cults." *Id.*

Because Raniere's control over her was so complete, Kathy was given myriad tasks to complete. But her involvement with the organization is distinguishable from that of her co-defendants. Unlike many of them, the tasks she was given did not come with power. Nor did Kathy engage in the type of persistent coercive behavior that was the signature modus operandi of NXIVM; she did not mete out punishments or demand amends for "ethical breaches." Just the opposite. More often than not, Kathy was at the receiving end of these tactics. Finally, unlike many individuals, some who were not even charged in this case, Kathy did not monetarily benefit from her association with NXIVM. She was rendered penniless, one more way that the organization entrapped her.

## II. Incarceration is Not Needed to Prevent Recidivism or Achieve Specific Deterrence Because Kathy Has Denounced NXIVM and is Rebuilding her Life

Several factors make clear that a sentence of imprisonment is not necessary to deter Kathy from engaging in similar conduct, most notably her extraordinary post-arrest rehabilitation efforts and her acceptance of responsibility. *See, e.g., United States v. Cosme*, No. 06-cr-608 (JBW), 2010 WL 276599, at *2 (E.D.N.Y. Jan. 19, 2010) ("Specific deterrence is satisfied because it is improbable that [defendant] will engage in further criminal activity in light of his lack of any prior criminal history, acceptance of responsibility, . . . and supportive family members.").

First, when it established the Sentencing Commission, it was Congress's intent that first-time non-violent offenders like Kathy receive non-custodial sentences. *See* 28 U.S.C. § 994(j) (applicable where the offense is not a "crime of violence or an otherwise serious offense"); *see Mistretta v. United States*, 488 U.S. 361, 377 (1989). The Commission itself has acknowledged Congress's mandate in its amendments to the guidelines, which provide that courts should consider imposing a sentence other than imprisonment for nonviolent first-time offenders who

fall within Zone A or B of the Sentencing Table. *See* U.S.S.G. § 5C1.1, Application Note 4. Thus, while the applicable guidelines range here is 6 to 12 months, the Commission authorizes a non-custodial sentence.

The most significant factor in this analysis, however, is Kathy's denouncement of NXIVM and her efforts to rebuild her life. "[A] court's duty is always to sentence the defendant as [s]he stands before the court on the day of sentencing." *Pepper v. United States*, 562 U.S. 476, 492 (2011) (citing *United States v. Bryson*, 229 F.3d 425, 426 (2d Cir. 2000) (per curiam)). In other words, courts should utilize the "most up-to-date picture" of a defendant's "history and characteristics." *Pepper*, 562 U.S. at 492. As such, a defendant's pre-sentencing rehabilitation efforts are extremely relevant to the court's sentencing analysis and often justify a variance from the guidelines. *See United States v. K*, 160 F. Supp. 2d 421, 442 (E.D.N.Y. 2001) ("[T]his circuit has recognized repeatedly that in deciding whether to depart downward a sentencing court may consider any pre-sentence rehabilitation that a defendant has demonstrated as well as the likelihood that probation rather than prison will facilitate a defendant's future rehabilitation."); *United States v. Blake*, 89 F. Supp. 2d 328, 346 (E.D.N.Y. 2000) (variance is appropriate where defendant has "taken responsibility for [her] actions", acted to reintegrate [herself] into a productive society", and where "prison would reverse the progress that she has made.").

Here, the pre-sentencing rehabilitation efforts are indeed extraordinary. Kathy has taken enormous steps to repair herself, her career, her family, and her relationships. She removed herself physically from the NXIVM community by moving to Georgia, and hopes to start a new, quiet life with her son in North Carolina. She has apologized to both her son and her sister for the harm that she caused. Kathy has not only learned to lean on Silas and Kelly for assistance and comfort but has become a support system for both of them. Further, Kathy has started her

own company, which will allow her to become self-sufficient and provide for and teach certain business skills to Silas.

Most importantly, as this submission makes abundantly clear, Kathy has wholeheartedly rejected NXIVM, including its leader, Raniere and his teachings.   In her letter, she writes: "[Raniere] is a monster who destroyed so many lives . . . It is truly a horror that I believed Keith was an honest, honorable man.  I have never known or met anyone who went to the lengths he did to manipulate, abuse, and harm."  *See* Exhibit D.  She has not only accepted full responsibility for her actions but has also worked hard, in therapy and on her own, to ensure that she is never subjected to any sort of manipulation or control in the future.  Kathy is devoted to continuing her efforts towards self-improvement and to living honestly, generously, and in accordance with the law.

A noncustodial sentence will allow Kathy to continue on this positive path.  On the other hand, incarceration would halt her progress, including by disrupting her therapy, her work and future prospects, and her reintegration into her family and society.  As Kathy's step-mother notes:

> Kathy is finally getting her life together.  She has her family back and a good job. My big concern as we approach the October sentencing is that if Kathy were to go to jail it would disrupt her progress and, I imagine, make it very difficult for her to get a job afterward.  Kathy is already 62.  Seniors, as it is, can have a tough time finding work and I don't know how she will be able to support herself without any job prospects.  I ask that you show leniency in sentencing Kathy so that she can continue on her journey towards rehabilitation. I know she is working hard to make things right.

Exhibit A (J. Marilyn Charlotte Letter).  *See also id.* (David Ashen Letter ("I do believe that a just outcome for Kathy would be for her to remain outside of prison so that she can continue to grow and contribute to society in a more positive way.")); *id.* (Kelly Russell Letter ("There is nothing positive that would occur in incarcerating her – in fact, I worry that it would devastate

her more.")); *id.* (Silas Bryant Letter ("As a son, I beg that you recognize that my mother has done the hard work to be a better person. That she has done the hard work to make amends and rebuild relationships, and that her punishment for her involvement in NXIVM will be lifelong.")). Dr. Pearson, who spent considerable time evaluating Ms. Russell between November 2020 and September 2021, concludes that she "has made significant progress in gaining insight and understanding" into herself, her circumstances, her decisions, and how her actions affect others. Exhibit C at 7. As one friend concludes: "Kathy has recognized the errors she has made . . . [and] has become wiser due to them. It is highly unlikely she'd make the same mistakes again." Exhibit A (Pat Maloney Letter).

Kathy's extraordinary rehabilitation is good evidence that a jail sentence is not needed to deter her from committing future crimes or protect the public. *See Pepper*, 562 U.S. 476 at 491-92 ("[r]ehabilitation may also critically inform a sentencing judge's overarching duty under § 3553(a) to 'impose a sentence sufficient, but not greater than necessary,' to comply with the sentencing purposes set forth in § 3553(a)(2)"); *United States v. Maier*, 975 F.2d 944, 948 (2d Cir. 1992). We respectfully submit that Kathy, her family, and society as a whole will be best served by allowing her to continue her recovery and rehabilitation.

### III.   Incarceration is Not Needed to Promote Respect for the Law or Achieve Just Punishment or General Deterrence

A custodial sentence here would be greater than necessary to promote respect for the law, and to achieve just punishment and general deterrence. As an initial matter, while we do not doubt the seriousness of the offense, it bears emphasis that a period of probation constitutes a real punishment. While custodial sentences are indisputably more severe than probationary terms, as the Supreme Court has recognized, "[o]ffenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty." *Gall v. United States*, 552

U.S. 38, 48 (2007). For example, "[p]robationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking. Most probationers are also subject to individual 'special conditions' imposed by the court." *Id.* (internal citation omitted).

It is also important to emphasize that Kathy has already suffered, and continues to suffer, collateral consequences from her participation in the charged conduct. Kathy was arrested by the FBI and for three years has been living with significant restrictions to her liberty; for the first year she was subject to a curfew with electronic monitoring. She was also subjected to pretrial restrictions limiting her contacts, the unwanted attention of paparazzi, and public humiliation forever memorialized on the internet. The relentless media outlets tarnished Kathy's name and reputation, falsely linking her in the press to sexual transgressions she was not a part of and knew nothing about.

In short, Kathy has been punished, and will continue to be punished, in myriad ways for her participation in NXIVM and its criminal acts. As her son, Silas, puts it:

> [S]he was financially and emotionally controlled by NXIVM, convinced by others in the program that she had no way out . . . She basically spent 20 years of her life as an indentured servant. While the arrest and prosecution has been traumatic in its own way, I am grateful that it helped wake her – and so many other people – up. That being said, I truly believe that she does not need to go to jail. She, and my entire family, have been punished enough.

Exhibit A (Silas Bryant Letter). Similarly, Kathy's sister writes:

> I respectively request that you show Kathy leniency. She is a resilience person but incarcerating her would push her over the edge. She has been through so much already – it is as if she is recovering from multiple traumas. Not only was she victimized by Keith, but the last three years have also caused her immense stress and anxiety. Just the threat of going to prison has been enough. No matter

what, she will live with the consequences of this case and her actions forever . . . I
hope that I have portrayed Kathy to be a good and decent person who has already
suffered so much from being associated with NXIVM.

*Id.* (Kelly Russell Letter). *See also id.* (David Ashen Letter ("The last few years have been a

prison for [Kathy] in many ways and allowed her to truly rehabilitate herself.")). The Court is

well within its authority to take these collateral consequences into account in fashioning an

appropriate sentence. *See United States v. Nesbeth*, 188 F. Supp. 3d 179, 194-95 (taking

collateral consequences of conviction into account in sentencing defendant with 33-41 months'

Guidelines range to one year probation and community service).

### IV.     The Needs of Kathy's Family Weigh in Favor of a Non-Custodial Sentence

The Court should also consider a defendant's family circumstances when determining an

appropriate sentence under 18 U.S.C. § 3553(a). *United States v. Coello*, 415 F.Supp.3d 306,

310 (E.D.N.Y. 2019) (noting that, post-*Booker*, courts may give more weight to the "crucial

consideration" of familial relationships). Here, not only would incarceration punish Kathy, but it

would also significantly harm her family, most notably her son. Kathy is helping Silas "get back

on [his] feet, financially and psychologically," and is his "principal support system." Exhibit A

(Silas Bryant Letter). Silas wants to move to North Carolina with his mother so that he can get

his college degree, of which he is only a year and half away from completing. *Id.* Recognizing

how important therapy has been in his life, Silas hopes to one day get his master's in behavioral

psychology so that he can help others in the same way. *Id.* Silas fears that incarceration for his

mother would disrupt these plans and cause havoc on him emotionally. He explains:

> For my mother to go to jail now would mean losing her again and losing precious
> time. After her life altering abandonment of me, I am only just now forming a
> deeper relationship with her and allowing myself to depend on her. I believe this
> is a healthy step towards rebuilding our mother-son relationship. But if she
> were incarcerated, I would once again be forced to be emotionally and economically
> independent. A forced separation like that would derail all the personal progress
> that both she and I are making together; and for me personally, it would make it

impossible for me to continue my education in the way that I hope to. Put simply, her going to jail would be devastating. I beg Your Honor to take these considerations into account when imposing sentence.

*Id.*

Kathy's sister, Kelly, also worries about the emotional and financial hardships that Kathy's incarceration would bring to her life. Kelly explains:

> Incarcerating [Kathy] would also be a hardship on me. If she goes to prison, she may never become self-sufficient. I shall be retiring in a few years and will have limited resources to help Kathy. It is important that she continue building her company so that she can support herself and her son. It would also be devastating for me to lose Kathy just as we are beginning to reestablish our relationship. I have few people that I can trust and I now rely on Kathy for her emotional support. I would be crushed if Kathy was taken away from me during this difficult time in my life.

*Id.* (Kelly Russell Letter).[7]

A noncustodial sentence is appropriate where, as here, a defendant's "family is going to benefit more by [the defendant's] presence than society is going to benefit from [the defendant's] incarceration." *United States v. Husein*, 478 F.3d 318, 324 (6th Cir. 2007). A sentence of probation will be a real, continued punishment for Kathy, and is sufficient to achieve the purposes of sentencing without needlessly punishing her family.

## **CONCLUSION**

Based on the foregoing, we respectfully urge that the Court sentence Kathy Russell to a term of probation. Such a sentence will be sufficient and not greater than necessary to satisfy the purposes of sentencing under 18 U.S.C. § 3553(a).

---

[7] Kathy's friends similarly rely on Kathy for her love and support and also fear losing her to prison. *See* Exhibit A (Karen Abney Letter ("[Kathy] has been there for me through all the middle of the night phone calls and the tears as I reached out for her support [after losing multiple family members during the pandemic]. I cannot imagine my life without being able to reach out to Kathy for support.")); *id.* (Angel Smith Letter ("If Kathy went to jail, it would be devastating for Kathy, her family, and also for me. She may not be my biological sister, but she might as well be, as she is one of my closest friends in the world. I depend on Kathy for her insight, her care and her support.")).

Dated: New York, New York
October 4, 2021

Respectfully submitted,

By:      /s/ Justine A. Harris
Justine A. Harris
Amanda Ravich
Sher Tremonte LLP
90 Broad Street, 23rd Floor
New York, NY 10004
(212) 202-2600
jharris@shertremonte.com

*Attorneys for Kathy Russell*